No. 13-5272

## UNITED STATES COURT OF APPEALS
## DISTRICT OF COLUMBIA CIRCUIT

LENEUOTI F. TUAUA, *et al.*,
Plaintiffs-Appellants,

v.

UNITED STATES OF AMERICA, *et al.*
Defendants-Appellees.

_____

On Appeal from the United States District Court for the District of Columbia
_____

## BRIEF OF PLAINTIFFS-APPELLANTS
_____

Neil C. Weare
WE THE PEOPLE PROJECT
1421 T Street N.W., Ste. 10
Washington, D.C.  20009
(202) 304-1202

Charles Ala'ilima
LAW OFFICE OF
  CHARLES V. ALA'ILIMA, PLLC
P.O. Box 1118
Nu'uuli, AS 96799
(684) 699-6732

Robert J. Katerberg
Murad Hussain
Elliott C. Mogul
Dawn Y. Yamane Hewett
Robert A. DeRise
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C.  20004-1206
(202) 942-5000
Murad.Hussain@aporter.com

*Counsel for Plaintiffs-Appellants Leneuoti F. Tuaua; Va'aleama T. Fosi;*
*Fanuatanu F. L. Mamea, on his own behalf and on behalf of his minor children,*
*M.F.N., L.C.M., and E.T.M.; Taffy-Lei T. Maene; Emy F. Afalava;*
*and the Samoan Federation of America, Inc.*

## CERTIFICATE AS TO PARTIES.
## RULINGS UNDER REVIEW, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel for Plaintiffs-Appellants hereby certify as follows:

### A.    Parties and *Amici Curiae*

Plaintiffs-Appellants ("Plaintiffs") are Leneuoti F. Tuaua; Va'aleama T. Fosi; Fanuatanu F. L. Mamea, on his own behalf and on behalf of his minor children, M.F.N., L.C.M., and E.T.M.; Taffy-Lei T. Maene; Emy F. Afalava; and the Samoan Federation of America, Inc.  As required by Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, a corporate disclosure statement for Samoan Federation of America, Inc. follows this certification.

Defendants-Appellees ("Defendants") are the United States of America; the U.S. Department of State ("State Department"); John F. Kerry, in his official capacity as Secretary of the U.S. Department of State; and Janice L. Jacobs, in her official capacity as U.S. Assistant Secretary of State for Consular Affairs.

In the proceedings below, Congressman Eni F.H. Faleomavaega participated as *amicus curiae*.  In this appeal, the Congressman and the American Samoa Government jointly filed a Motion to Intervene or, in the Alternative, for Leave to Participate as *Amici Curiae*.  On February 4, 2014, a panel of this Court referred consideration of the motion to the merits panel.  Plaintiffs do not oppose these Movants' participation in this appeal as *amici curiae*, but do oppose intervention.

*See infra* Argument § III.

The following entities have also appeared in this appeal, seeking leave to participate as *amici curiae*:

*Amici curiae* in support of Plaintiffs:  Congresswomen Madeleine Z. Bordallo and Donna Christensen, and Professor Samuel Erman.

*Amici curiae* in support of neither party:  Professor Gary S. Lawson and Professor Christina Duffy Ponsa.

**B.     Ruling Under Review**

Plaintiffs appeal from the Opinion and Order granting Defendants' Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6), issued by the United States District Court for the District of Columbia, Judge Richard J. Leon, on June 26, 2013.  JA38-55.  The Opinion is published at 951 F. Supp. 2d 88.

**C.     Related Cases**

Plaintiffs and counsel know of no related cases.

Dated:  April 25, 2014                     Respectfully submitted,

                                            /s/ Murad Hussain

                                           Murad Hussain
                                           ARNOLD & PORTER LLP
                                           555 Twelfth Street, N.W.
                                           Washington, D.C.  20004-1206
                                           (202) 942-5000
                                           Murad.Hussain@aporter.com

                                           *Counsel for Plaintiffs-Appellants*

ii

## **RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

Plaintiff Samoan Federation of America, Inc. respectfully submits this disclosure statement pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1.

Samoan Federation of America, Inc., is a 501(c)(3) non-profit organization based in Carson, California. Samoan Federation of America, Inc. is a social services organization that serves the Samoan community in the greater Los Angeles area. Samoan Federation of America, Inc. has no parent corporations, and no publicly held company is known to have a 10% or greater interest in it.

Dated:  April 25, 2014                            Respectfully submitted,


                                                  /s/ Murad Hussain

                                                 Murad Hussain
                                                 ARNOLD & PORTER LLP
                                                 555 Twelfth Street, N.W.
                                                 Washington, D.C.  20004-1206
                                                 (202) 942-5000
                                                 Murad.Hussain@aporter.com

                                                 *Counsel for Plaintiff-Appellant*
                                                 *Samoan Federation of America, Inc.*

# <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

CERTIFICATE AS TO PARTIES. RULINGS UNDER REVIEW, AND RELATED CASES .................................................................................. i

    A.    Parties and *Amici Curiae* .................................................. i

    B.    Ruling Under Review ......................................................... ii

    C.    Related Cases ...................................................................... ii

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ................................... iii

GLOSSARY .......................................................................................... xvi

INTRODUCTION .................................................................................... 1

STATEMENT OF JURISDICTION ............................................................... 3

STATEMENT OF THE ISSUES ................................................................... 3

STATUTES AND REGULATIONS ............................................................... 3

STATEMENT OF THE CASE ..................................................................... 4

I.    STATEMENT OF FACTS .............................................................. 4

    A.    American Samoa Has Long Been A Part Of The United States. .......... 4

    B.    Defendants Do Not Recognize Plaintiffs As U.S. Citizens. ................ 6

    C.    Plaintiffs Have Been Harmed By The "Non-Citizen National" Label. ................................................................................ 7

II.    PROCEDURAL HISTORY ............................................................ 9

SUMMARY OF ARGUMENT .................................................................... 10

STANDARD OF REVIEW ........................................................................ 14

ARGUMENT ..................................................................................15

I.  THE FOURTEENTH AMENDMENT GUARANTEES CITIZENSHIP
    TO PERSONS BORN IN ALL U.S. TERRITORIES, INCLUDING
    AMERICAN SAMOA. ...............................................................15

    A.  The Text And Original Understanding Of The Citizenship
        Clause Confirm That "The United States" Includes American
        Samoa. ...........................................................................17

        1.  The Fourteenth Amendment's text and structure confirm
            that "the United States" is not limited to the States alone. .......18

        2.  The Reconstruction Congress understood that "the
            United States" includes Territories. ..........................................19

            a.  The Citizenship Clause's historical context
                informed its Framers' original understanding. ...............20

            b.  The 1866 Civil Rights Act's text and drafting
                history confirm that "the United States" includes
                Territories. ....................................................................21

            c.  The Citizenship Clause's drafting history confirms
                that "the United States" includes Territories. ................23

        3.  Authoritative Supreme Court decisions interpret the
            Citizenship Clause's scope as including Territories. ...............25

    B.  The District Court Relied On Authorities That Do Not
        Supersede The Original Understanding Of The Citizenship
        Clause. ...........................................................................29

        1.  The *Insular Cases* do not govern this case. .............................29

            a.  The *Insular Cases* did not concern the Citizenship
                Clause. .........................................................................30

            b.  The district court incorrectly relied on Justice
                Brown's individual comments about citizenship in
                *Downes v. Bidwell*. .......................................................34

2.    The Thirteenth Amendment does not narrow the scope of "the United States" as used in the Fourteenth Amendment. ..............................................................37

3.    The district court's other cited authorities do not control this case. ..................................................................41

4.    Later Congresses' practice cannot alter the Citizenship Clause's meaning. ...................................................45

II.    THE CONSTITUTION'S GUARANTEE OF BIRTHRIGHT CITIZENSHIP APPLIES IN AMERICAN SAMOA WHETHER OR NOT IT IS AN "UNINCORPORATED" TERRITORY. ...........................46

A.    Birthright Citizenship Is A Fundamental Right. ................................48

B.    Persons Born In American Samoa Are Entitled To Constitutional Birthright Citizenship Unless It Would Be "Impractical And Anomalous." ...........................................................51

1.    *King v. Morton* requires an assessment of contemporary circumstances. ........................................................52

2.    The Supreme Court has also endorsed a context-sensitive reading of the *Insular Cases*. ....................................56

3.    Birthright citizenship would not be "impractical and anomalous" in American Samoa. ...............................57

III.    THE PUTATIVE INTERVENORS DO NOT SATISFY THE STRICT STANDARD FOR INTERVENTION ON APPEAL. ..................................60

CONCLUSION ......................................................................................61

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

STATUTORY AND REGULATORY ADDENDUM

# TABLE OF AUTHORITIES[*]

**Page(s)**

**Cases**

\* *Afroyim v. Rusk*,
   387 U.S. 253 (1967)..................................................................33, 36, 49, 50

*Alden v. Maine*,
   527 U.S. 706 (1999)..........................................................................17, 18, 25

*Alt. Research & Dev. Found. v. Veneman*,
   262 F.3d 406 (D.C. Cir. 2001).................................................................60

*Amalgamated Transit Union Int'l, AFL-CIO v. Donovan*,
   771 F.2d 1551 (D.C. Cir. 1985).............................................................60

*Anonymous* (*In re Naturalization Petition*),
   1 F. Cas. 1016 (S.D.N.Y. 1846)............................................................27

*Armstrong v. United States*,
   182 U.S. 243 (1901)...............................................................................30

*Atherton v. D.C. Office of the Mayor*,
   567 F.3d 672 (D.C. Cir. 2009)..............................................................14

*Balzac v. Porto Rico*,
   258 U.S. 298 (1922)...............................................................................30

*Barber v. Gonzales*,
   347 U.S. 637 (1954)...............................................................................41

\* *Boumediene v. Bush*,
   553 U.S. 723 (2008)..........................................31, 32, 33, 42-43, 47, 48, 56, 57

*In re Chung Fat*,
   96 F. 202 (D. Wash. 1899)................................................................37-38

---

[*] Authorities upon which Plaintiffs-Appellants chiefly rely are marked with asterisks.

*Collins v. Youngwood,*
    497 U.S. 37 (1990)............................................................22

*Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day
    Saints v. Hodel,*
    830 F.2d 374 (D.C. Cir. 1987)......................................54, 55

*De Lima v. Bidwell,*
    182 U.S. 1 (1901)............................................................30

*District of Columbia v. Heller,*
    554 U.S. 570 (2008)................................................ 15-16, 25, 45

*Dooley v. United States,*
    182 U.S. 222 (1901)........................................................30

*Dooley v. United States,*
    183 U.S. 151 (1901)........................................................30

*Dorr v. United States,*
    195 U.S. 138 (1904)................................................ 30, 31-32

*Dowdell v. United States,*
    221 U.S. 325 (1911)........................................................30

*Downes v. Bidwell,*
    182 U.S. 244 (1901)................................ 12, 30, 34, 35, 36, 40

*Dred Scott v. Sanford,*
    60 U.S. 393 (1856)..........................................1, 11, 20

*Eche v. Holder,*
    694 F.3d 1026 (9th Cir. 2012) ....................................42, 44

*Elk v. Wilkins,*
    112 U.S. 94 (1884)....................................25, 26, 27, 29

*Fourteen Diamond Rings v. United States,*
    183 U.S. 176 (1901)........................................................30

*Gen. Bldg. Contractors Ass'n v. Pennsylvania,*
    458 U.S. 375 (1983)................................................ 21-22

*Goetze v. United States*,
  182 U.S. 221 (1901)..................................................................................30

*Gonzales v. Williams,*
  192 U.S. 1 (1904)................................................................................ 30-31

*Grafton v. United States*,
  206 U.S. 333 (1907)..............................................................................30

*Hawaii v. Mankichi,*
  190 U.S. 197 (1903)..............................................................................30

*Huus v. N.Y. & Porto Rico Steamship Co.*,
  182 U.S. 392 (1901)..............................................................................30

*Jett v. Dallas Indep. Sch. Dist.*,
  491 U.S. 701 (1989)..............................................................................21

*Kennedy v. Mendoza-Martinez,*
  372 U.S. 144 (1963)..................................................................16, 49, 50

*Kent v. Porto Rico*,
  207 U.S. 113 (1907)..............................................................................30

*Kepner v. United States,*
  195 U.S. 100 (1904)..............................................................................30

*King v. Andrus,*
  452 F. Supp. 11 (D.D.C. 1977)......................................................47, 53, 54

* *King v. Morton*,
  520 F.2d 1140 (D.C. Cir. 1975)...................... 2, 3, 14, 47, 48, 51, 52, 53, 54, 59

*King v. Palmer,*
  950 F.2d 771 (D.C. Cir. 1991) (*en banc*) ............................................35

*Kopel v. Bingham,*
  211 U.S. 468 (1909)..............................................................................30

*Lacap v. INS,*
  138 F.3d 518 (3d Cir. 1998) (*per curiam*) ........................................42

*LaShawn A. v. Barry*,
   87 F.3d 1389 (D.C. Cir. 1996) (*en banc*) ........................................................54

*Licudine v. Winter*,
   603 F. Supp. 2d 129 (D.D.C. 2009)....................................................42

*Loughborough v. Blake*,
   18 U.S. 317 (1820)..............................................................................18

*Lynch v. Clarke*,
   1 Sand. Ch. 583 (N.Y. Ch. 1844).......................................................20

*Mendoza v. Soc. Sec. Comm'r*,
   92 F. App'x 3 (D.C. Cir. 2004)...........................................................42

*Mendozana v. United States*,
   195 U.S. 158 (1904)............................................................................30

*Miller v. Albright*,
   523 U.S. 420 (1998)............................................................................44

*Nat'l Bank v. County of Yankton*,
   101 U.S. 129 (1880)............................................................................28

* *Noel Canning v. N.L.R.B.*,
   705 F.3d 490 (D.C. Cir.),
   *cert. granted*, 133 S. Ct. 2861 (2013) ..................... 15, 17, 18, 19, 22, 25, 41, 45

*Nolos v. Holder*,
   611 F.3d 279 (5th Cir. 2010) (*per curiam*).......................................42

*Ocampo v. United States*,
   234 U.S. 91 (1914)..............................................................................30

*Overby v. Nat'l Ass'n of Letter Carriers*,
   595 F.3d 1290 (D.C. Cir. 2010)....................................................28, 29

*Parker v. District of Columbia*,
   478 F.3d 370 (D.C. 2007)..............................................................16, 17

*Perez v. Brownell*,
   356 U.S. 44 (1958)..............................................................................50

*Rabang v. Boyd*,
    353 U.S. 427 (1957)................................................................43

*Rabang v. INS*,
    35 F.3d 1449 (9th Cir. 1994) ...........................................42, 51

*Rasmussen v. United States*,
    197 U.S. 516 (1905)................................................................30

*Rasul v. Myers*,
    563 F.3d 527 (D.C. Cir. 2009)................................................31

*Reid v. Covert*,
    354 U.S. 1 (1957)..............................................................31, 52

*Saenz v. Roe*,
    526 U.S. 489 (1999)................................................................46

*Schneider v. Rusk*,
    377 U.S. 163 (1964)................................................................49

*In re Sealed Case*,
    722 F.3d 361 (D.C. Cir. 2013)................................................14

\* *Slaughter-House Cases*,
    83 U.S. 36 (1872)........................................... 11, 21, 25, 26, 29, 50

*Trono v. United States*,
    199 U.S. 521 (1905)................................................................30

*Trop v. Dulles*,
    356 U.S. 86 (1958)................................................................50

*U.S. Term Limits, Inc. v. Thornton*,
    514 U.S. 779 (1995)................................................................50

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990)................................................................57

\* *United States v. Wong Kim Ark*,
    169 U.S. 649 (1898)...........................12, 16, 25, 26, 27, 45-46, 48-49

*Valmonte v. INS*,
    136 F.3d 914 (2d Cir. 1998) ........................................................42, 51

*Wabol v. Villacrusis*,
    958 F.2d 1450 (9th Cir. 1990) ...............................................58

*Weedin v. Chin Bow*,
    274 U.S. 657 (1927).......................................................16, 26, 29

## Federal Constitutional Provisions

U.S. Const., Amend. XIII, § 1 ........................................................13, 37

* U.S. Const., Amend. XIV, § 1, cl. 1 ...............................1, 3, 15, 19, 37

U.S. Const., amend. XIV, § 1, cl. 2 ....................................................50

U.S. Const., Amend. XIV, § 2 ...........................................................19

U.S. Const., Art. I, § 8, cl. 2 ...........................................................34

U.S. Const., Art. I, § 8, cl. 4..........................................................44

U.S. Const., Art. IV, § 3, cl. 2 ........................................................31

## Federal Statutes and Treaties

8 U.S.C. § 1101(a)(22)...................................................................58

8 U.S.C. § 1101(a)(29)...................................................................6, 58

8 U.S.C. § 1401(e) ......................................................................57

8 U.S.C. § 1408(1), codifying
    Immigration and Nationality Act of 1952, § 308(1)......................6, 9, 10, 17, 58

28 U.S.C. § 1291.........................................................................3

28 U.S.C. § 1331 ........................................................................3

48 U.S.C. § 1662.......................................................................4, 6

Civil Rights Act of 1866, 14 Stat. 27 (1866) ...........................................................22

General Act of the Conference at Berlin, art. III, § 10 (1889) ......................... 33-34

Instrument of Cession by the Chiefs Manu'a Islands to the U.S. Government (July 14, 1904) ................................................................................................ 4-5

Instrument of Cession by the Chiefs Tutila to the U.S. Government (Apr. 17, 1900)...........................................................................................4

Naturalization Act of 1795, 1 Stat. 414, § 1 ..........................................................27

Naturalization Act of 1798, 1 Stat. 566, § 1 ..........................................................27

Treaty of Friendship and Commerce between the United States of America and the Government of the Samoan Islands, 20 Stat. 704 (Jan. 17, 1878) ....................39

Tripartite Convention, art. II, Dec. 2, 1899, 31 Stat. 1878 .....................................34

## Federal Rules and Administrative Materials

23 U.S. Op. Atty. Gen. 629 (Feb. 17, 1902) ..........................................................34

Fed. R. Civ. P. 12(b)(6)...............................................................................3, 10, 14

U.S. Dep't of State, Foreign Affairs Manual, 7 FAM § 1125.1 ................. 6-7, 9, 17

U.S. Dep't of State, Foreign Affairs Manual, 7 FAM § 1130, App'x H..................6

U.S. Dep't of State, Updated Core Document, Report to the United Nations Committee on Human Rights Concerning the International Covenant on Civil and Political Rights (Oct. 2005) ........................................................................4

## Federal Constitutional Drafting Debates

Cong. Globe, 38th Cong., 1st Sess. 145 (1864)......................................................38

Cong. Globe, 38th Cong., 1st Sess. 521 (1864)......................................................38

Cong. Globe, 38th Cong., 1st Sess. 553 (1864)................................................. 38-39

Cong. Globe, 38th Cong., 1st Sess. 1313 (1864)..................................................38

Cong. Globe, 38th Cong., 1st Sess. 1314 (1864)..................................................39

Cong. Globe, 39th Cong., 1st Sess. 600 (1866)................................................ 22-23

Cong. Globe, 39th Cong., 1st Sess. 1679 (1866)..................................................23

Cong. Globe, 39th Cong., 1st Sess. 1832 (1866)..................................................23

Cong. Globe, 39th Cong., 1st Sess. 2768 (1866)................................................ 20-21

Cong. Globe, 39th Cong., 1st Sess. 2890 (1866)..............................................23, 24

Cong. Globe, 39th Cong., 1st Sess. 2892 (1866)..................................................24

Cong. Globe, 39th Cong., 1st Sess. 2893 (1866)..................................................24

Cong. Globe, 39th Cong., 1st Sess. 2894 (1866)........................................ 19-20, 24

Cong. Globe, 39th Cong., 1st Sess. 2896 (1866)..................................................21


## State and Territorial Constitutional Provisions and Statutes

Am. Samoa Const., arts. I-IV..............................................................................5

A.S.C.A. § 41.0202(j) .........................................................................................58

Haw. Const. art. II, § 1 .................................................................................... 7-8

Haw. Rev. Stat. § 134-2(d) ............................................................................. 7-8


## Other Authorities

Charles E. Littlefield, *The Insular Cases (II: Dred Scott v. Sandford)*,
   15 Harv. L. Rev. 281 (1901).......................................................18-19, 39, 40-41

L.S. Rowe, *The Supreme Court and the Insular Cases*, 18 Annals Am. Acad. Pol.
   & Soc. Sci. 38 (1901)...........................................................................................35

Anna Williams Shavers, *A Century of Developing Citizenship Law and the Nebraska Influence: A Centennial Essay*, 70 Neb. L. Rev. 462 (1991)............26

Report of the Joint Committee on Reconstruction (1866)......................................21

Stmt. of the Hon. Eni F.H. Faleomavaega Before the U.N. Special Comm. On Decolonization, Havana, Cuba (May 23, 2001)................................................43

# <u>GLOSSARY</u>

**A.S.C.A.**          American Samoa Code Annotated

**FAM**          U.S. Department of State Foreign Affairs Manual

**INA**          Immigration and Nationality Act of 1952

**JA**          Joint Appendix

## <u>INTRODUCTION</u>

The Citizenship Clause of the Fourteenth Amendment to the U.S. Constitution provides that "[a]ll persons born . . . in the United States . . . are citizens of the United States . . . ." U.S. Const., amend. XIV, § 1, cl. 1. The Reconstruction Congress wrote the Clause immediately after the Civil War to overturn *Dred Scott v. Sandford*, 60 U.S. 393 (1856), and to place the guarantee of citizenship by birth on U.S. soil forever beyond Congress's legislative reach. The Clause's Framers understood that it guarantees citizenship to anyone born anywhere within the United States' geographical limits, in States and Territories alike.

Plaintiffs were born in the U.S. Territory of American Samoa, which voluntarily joined the United States in 1900 and has been within its geographical limits and under its exclusive jurisdiction and sovereignty for the last 114 years. Despite the Citizenship Clause's express guarantee of birthright citizenship, Defendants refuse to recognize Plaintiffs as citizens. Instead, they label Plaintiffs with the inferior status of "non-citizen nationals" solely because they were born in American Samoa. This anomalous label of "non-citizen national" applies only to American Samoans, and it relies on an unconstitutional statute and a misreading of the Constitution and precedent.

This is the first known case where people born in a current Territory have sued the government for refusing to recognize them as U.S. citizens.  The reason is relatively simple:    American Samoa is the *only* inhabited Territory where Defendants do not recognize that birth alone confers U.S. citizenship.  Defendants and the decision below have wrongly suggested that because Plaintiffs' claims present questions of first impression, this somehow warranted dismissal.

Until the decision below, *no* court had ever held that people born in a current Territory are not born "in the United States" within the meaning of the Citizenship Clause.  This Court should reject Defendants' efforts to rewrite the scope of constitutional birthright citizenship.  Instead, fidelity to the Citizenship Clause's text, history, and authoritative interpretations by the Supreme Court in the years following its ratification, confirm its application in the Territories.   In the alternative, this Court should follow the framework it previously set forth in *King v. Morton*, 520 F.2d 1140 (D.C. Cir. 1975), for determining whether a particular constitutional right applies in American Samoa today.

Plaintiffs already owe permanent allegiance to the United States because of their birth on U.S. soil.  The Constitution requires that they also be recognized as citizens.

2

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under 28 U.S.C. § 1331. On June 26, 2013, the district court entered an opinion and order granting the Defendants' motion to dismiss Plaintiffs' claims pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim.  JA38-54, 55.  Plaintiffs timely filed their notice of appeal on August 23, 2013.  JA56-57.  This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Whether the district court erred by:

1.     Holding that the Citizenship Clause of the U.S. Constitution, which states that "[a]ll persons born . . . in the United States . . . are citizens of the United States," U.S. Const., amend. XIV, § 1, cl. 1, does not guarantee U.S. citizenship to persons born in American Samoa.

2.     Ordering dismissal without allowing evidence or making findings that it would be "impractical and anomalous" in the context of "the situation as it exists in American Samoa today," *King v. Morton*, 520 F.2d 1140, 1147 (D.C. Cir. 1975), to recognize that persons born in American Samoa have a constitutional right to citizenship by virtue of their birthplace.

## STATUTES AND REGULATIONS

All applicable provisions are contained in an addendum to this Brief.

## STATEMENT OF THE CASE

### I.    STATEMENT OF FACTS

#### A.    American Samoa Has Long Been A Part Of The United States.

American Samoa is part of the United States' "Insular Areas," which fall within the nation's geographical limits, *see* U.S. Dep't of State, Updated Core Document, Report to United Nations Comm. on Human Rights Concerning Int'l Covenant on Civil and Political Rights ("U.N. Report") ¶ 35 (Oct. 2005),[1] and are "an integral part of the U.S. political family," U.S. Dep't of State, U.N. Report ¶¶ 6-7 (Dec. 2011).[2] American Samoa is part of an archipelago located in the South Pacific, midway between Hawaii and New Zealand, historically known as the Samoan Islands.  JA10.  The eastern islands comprise American Samoa, and the western islands comprise the independent nation of Samoa.  JA10.

American Samoa became a U.S. Territory on April 17, 1900, when the traditional leaders of the Samoan islands of Tutuila and Aunu'u voluntarily ceded "all sovereign rights" in those islands "unto the Government of the United States of America."  Instrument of Cession by the Chiefs of Tutuila to the U.S. Government at 2 ¶ 1 (Apr. 17, 1900);[3] JA20; *see also* 48 U.S.C. § 1662.  Four years later, the

---

[1] *Available at* http://www.state.gov/j/drl/rls/55516.htm.

[2] *Available at* http://www.state.gov/j/drl/rls/179781.htm#art1.

[3] *Available at* http://www.asbar.org/images/unpublished_cases/cession1.pdf.

traditional leaders of the Samoan islands comprising the Manu'a island group also voluntarily ceded their lands "under the full and complete sovereignty of the United States of America." Instrument of Cession by the Chiefs of Manu'a Islands to the U.S. Government at 2 ¶ 2 (July 14, 1904);[4] JA20.

Today, American Samoa is self-governed, although it remains under the general supervision of the U.S. Department of the Interior. JA20. The Constitution of American Samoa was first adopted in 1960, subsequently revised in 1967 and 1977, and now provides for a governor and bicameral legislature, a judiciary independent of those political branches, and a Bill of Rights modeled after the federal Constitution. *See* Am. Samoa Const., arts. I-IV.[5] In 1978, Congress authorized a non-voting Delegate to the U.S. House of Representatives for American Samoa. JA20.

The population of American Samoa is approximately 55,000. JA21. Its children attend public schools and are taught in English using a U.S. curriculum. JA26. Many of these children grow up to enlist in the U.S. Armed Forces through the Army's recruiting station and programs in the local high schools and community college. JA21-22. In fact, American Samoa's enlistment rate is among

---

[4] *Available at* http://www.asbar.org/images/unpublished_cases/cession2.pdf.

[5] *Available at* http://www.asbar.org/index.php?option=com_content&view=article&id=1961.

the highest in the nation and, on a per capita basis, its population has made a greater sacrifice in Iraq and Afghanistan than any other U.S. jurisdiction.  JA21.  In these and other ways, American Samoa and its people have become politically, economically, and culturally intertwined with the rest of the United States in the 114 years since they joined the nation.  JA13.

### B.     Defendants Do Not Recognize Plaintiffs As U.S. Citizens.

Defendants recognize that Plaintiffs are Americans, but deny that they are U.S. citizens.  Section 308(1) of the Immigration and Nationality Act of 1952 ("INA"), codified at 8 U.S.C. § 1408(1), classifies Plaintiffs and others born in American Samoa as so-called "non-citizen nationals" of the United States.[6]  JA25.  As set forth in Appendix H to Section 1130 of Volume 7 of the State Department Foreign Affairs Manual ("FAM"), Defendants give effect to the "non-citizen national" classification by imprinting a disclaimer of citizenship known as "Endorsement Code 09" in the U.S. passports issued to Plaintiffs and others born in American Samoa.   JA27.   That disclaimer states: "THE BEARER IS A UNITED STATES NATIONAL AND NOT A UNITED STATES CITIZEN." JA27, 36-37.  Defendants imprint this disclaimer in reliance on INA § 308(1) and the State Department's policy that "the citizenship provisions of the Constitution

---

[6] The only other persons statutorily designated as "non-citizen nationals" are persons born on Swains Island, 8 U.S.C. §§ 1101(a)(29), 1408, but that location is recognized as part of American Samoa, 48 U.S.C. § 1662.

do not apply to persons born" in American Samoa. JA27; *see also* 7 FAM §
1125.1(b), (d).

### C.  Plaintiffs Have Been Harmed By The "Non-Citizen National" Label.

As alleged in the Complaint, the individual Plaintiffs were born in American
Samoa, so they do not enjoy the same rights as other Americans because of their
inferior statutory status as "non-citizen nationals." *See* JA11-18. Lead Plaintiff
Leneuoti FiaFia Tuaua lives with his family in American Samoa. In 1969, he
moved to California seeking educational and career opportunities. Despite his
desire to pursue a career in law enforcement, his statutory status kept him from
serving as a public safety officer in California. And although he registered for the
military draft, he was ineligible to vote under California law. Returning home to
American Samoa in 1976, he went on to serve a distinguished 30-year career in
law enforcement. But he does not want any doors of opportunity closed for his
children the way they were closed for him. JA11-12.

Plaintiff Va'aleama Tovia Fosi lives in Honolulu, Hawaii. As a high school
senior in American Samoa, the U.S. Army recruited him to join its early entry
program. After moving to Hawaii, he was commissioned in 1987 as an officer in
the Hawaii Army National Guard, went on to serve in the U.S. Army Reserve, and
received an honorable discharge in 1994 as a First Lieutenant. JA12-13. Despite
his service, he is denied the right to vote and the right to bear arms under Hawaii

law because of his "non-citizen national" status. *See* Haw. Const. art. II, § 1; Haw. Rev. Stat. § 134-2(d).

Plaintiff Fanuatanu F. L. Mamea lives in American Samoa where he and his wife raise their three children. As a young man, he moved to Hawaii, where he enlisted in the U.S. Army in 1964. He hoped to join the Special Forces but was told he was ineligible because of his "non-citizen national" status. He nonetheless went on to serve in Vietnam, where he sustained serious combat injuries for which he was awarded two Purple Hearts. He has a disability rating of 80%, and should he require travel to Hawaii for medical care, his statutory status will make it more difficult for his wife, who is a Tongan national, to join him, because he faces immigration sponsorship obstacles that people recognized as citizens do not. JA13-15.

Plaintiff Taffy-lei T. Maene has lived in Seattle, Washington since 2006. In 2012, she lost her job at the Washington State Department of Licensing, as well as her health insurance, because her statutory status made her unable to establish that she was a citizen. Under Washington law, she is also unable to exercise her right to vote. JA15-16.

Plaintiff Emy Fiatala Afalava lives in American Samoa. In 1981, the U.S. Army Reserve recruited him while he was still a high school student in American Samoa. Throughout his career, he has lived in several states and was deployed

8

overseas on multiple occasions, including serving in the Army infantry during the 1991 liberation of Kuwait.  In 1992, he was unable to join his fellow infantrymen to vote in the presidential election because of his statutory status.  He was honorably discharged in 1996 and returned to live in American Samoa in 1999. JA16-17.

Plaintiff Samoan Federation of America, Inc. ("Samoan Federation") is a social services organization serving the Samoan community in the greater Los Angeles area.  Founded in 1965, it assists many members of the Samoan community who are denied recognition as U.S. citizens because they were born in American Samoa.  The Samoan community's voting strength is diluted because Defendants do not recognize its members' citizenship.  Nonetheless, Samoan Federation does what it can to empower that community through assistance with the naturalization process and voter registration drives.  JA17-18.

## II.    PROCEDURAL HISTORY

Plaintiffs filed their Complaint on July 10, 2012, bringing this constitutional challenge to INA § 308(1), the State Department's policies at 7 FAM § 1125.1(b) and (d), and its policy and practice of imprinting Endorsement Code 09 in U.S. passports issued to persons born in American Samoa.  JA08-37.  Defendants moved to dismiss the Complaint on November 7, 2012.  Congressman Eni Faleomavaega filed an *amicus curiae* brief on November 15, 2012.  JA05-06.

9

On November 19, 2012, Plaintiffs filed a joint motion seeking to extend their time to oppose Defendants' motion to dismiss and for leave to combine their opposition with a cross-motion for summary judgment. JA06. The district court denied Plaintiffs' motion. Briefing on the motion to dismiss was completed on December 12, 2012, followed by oral argument on December 17, 2012. JA06-07.

On June 25, 2013, the American Samoa Government filed a motion to intervene. On June 26, 2013, the district court granted Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) and denied the pending intervention motion as moot.

Plaintiffs timely filed their notice of appeal on August 23, 2013.

## SUMMARY OF ARGUMENT

American Samoa is within the United States' geographical limits and under its exclusive jurisdiction and sovereignty, and has been for 114 years. Yet it is Defendants' policy to deny that Plaintiffs and others born in American Samoa are born "in the United States" within the meaning of the Citizenship Clause. Pursuant to that policy, Defendants have stamped Plaintiffs' U.S. passports with an express disavowal of their citizenship. Defendants' policy and practice violate the Citizenship Clause, as does INA § 308(1), the statute on which Defendants rely.

As the district court recognized, the central question in this case is whether American Samoa is "in the United States" within the meaning of the Citizenship

Clause.  JA46.  Answering that question in the negative, the district court failed to undertake a proper analysis of the relevant constitutional text, structure, and history.  Instead, it relied on unpersuasive and non-controlling authorities.

The Fourteenth Amendment's text and structure—particularly its contrasting uses of "the United States" and "the Several States"—confirm that the Citizenship Clause broadly encompasses Territories as well as States.  The Citizenship Clause's history reinforces this reading.  The Reconstruction Congress drafted the Clause after the Civil War to codify the preexisting common law *jus soli* rule that citizenship attaches upon birth anywhere on the sovereign's soil, and to repudiate the Supreme Court's contrary ruling in *Dred Scott*, which held that American-born descendants of African slaves could never become citizens.  The Clause's statutory blueprint—the Civil Rights Act of 1866—and the drafting debates about the Clause itself further reflect its Framers' intent to guarantee citizenship to persons born in any State *or* Territory.

Soon after the Fourteenth Amendment's ratification, the Supreme Court repeatedly interpreted the Citizenship Clause as encompassing birth within the United States' broad geographical limits.  In the *Slaughter-House Cases*, the Court explained that the Clause "put[] at rest" the argument that "[t]hose . . . who had been born and resided always in the District of Columbia or in the Territories, though within the United States, were not citizens."  83 U.S. 36, 72-73 (1872).

11

And shortly before American Samoa voluntarily joined the nation, the Court held in *United States v. Wong Kim Ark* that "[t]he Fourteenth Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country . . . ."  169 U.S. 649, 693 (1898).

Instead of focusing on the text, history, and authoritative judicial interpretations of the Citizenship Clause, the district court dismissed the Framers' statements reflecting their understanding as "stray comments."  JA51.  The court relied chiefly on the *Insular Cases*, a series of early 1900s decisions that examined the extent of Congress's power under Article IV's Property Clause to administer newly acquired Territories.  Each of those decisions concerned either revenue collection or criminal procedure; none of them concerned the Citizenship Clause.  Moreover, the *Insular Cases*' judicially created distinction between "incorporated" and "unincorporated" Territories cannot transform the original understanding of the Citizenship Clause.  The district court erred by overlooking that Congress's Property Clause power over territorial administration is constrained by the later-enacted Citizenship Clause, which was written *specifically* to withdraw Congress's power to restrict birthright citizenship in States *and* Territories alike.  The district court also erred by misreading Justice Brown's individual opinion in *Downes v. Bidwell*, 182 U.S. 244 (1901), one of the earliest *Insular Cases*, as reflecting the opinion of the Supreme Court itself.

The district court also undertook a flawed comparison of the Thirteenth and Fourteenth Amendments, from which it concluded that the phrase "the United States" excludes Territories. This conclusion disregarded the original understanding of both Amendments: "the United States" meant the entire Union of States *and* Territories alike. The Thirteenth Amendment simply went further by also prohibiting slavery *beyond* the United States' territorial limits, in "any place subject to their jurisdiction," U.S. Const., amend. XIII, § 1, such as American vessels, embassies, and military installations.

Additionally, the district court incorrectly relied on cases holding that people born in the Philippines before its independence in 1946, when it was temporarily held by the United States after the Spanish-American War, are not U.S. citizens today. Those decisions similarly misread Justice Brown's individual opinion in *Downes* as controlling precedent, incorrectly contrasted the Thirteenth and Fourteenth Amendments, and failed to examine the original understanding of the Citizenship Clause. They are also distinguishable because the United States acquired the Philippines—now an independent nation for almost 70 years—by conquest, and had never intended to hold it permanently, while American Samoa voluntarily joined this nation over a century ago and has remained under the United States' exclusive sovereignty and jurisdiction ever since.

13

To the extent the *Insular Cases* framework does apply here, the district court failed to apply the two-step analysis adopted by this Court in *King v. Morton*, which first requires an assessment of whether a right is "fundamental"; if it is not, the next question is whether the facts on the ground demonstrate that the right would be "impractical and anomalous" in American Samoa today. 520 F.2d at 1147-48. Birthright citizenship is a fundamental right because, as the Supreme Court has repeatedly explained, it derives from a common law tradition predating the United States itself and is an essential protection of individual liberty. In any event, contemporary circumstances in American Samoa confirm that recognizing birthright citizenship would not be impractical and anomalous. If anything, Plaintiffs' non-citizen national status, unique among people born in States and other Territories, is impractical and anomalous. Thus, Plaintiffs would be entitled to birthright citizenship under either prong of this Court's *Insular Cases* framework.

## <u>STANDARD OF REVIEW</u>

This Court reviews *de novo* a dismissal for failure to state a claim under Rule 12(b)(6). *Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009). Questions of law are also reviewed *de novo*. *In re Sealed Case*, 722 F.3d 361, 364 (D.C. Cir. 2013).

14

# ARGUMENT

## I.   THE FOURTEENTH AMENDMENT GUARANTEES CITIZENSHIP TO PERSONS BORN IN ALL U.S. TERRITORIES, INCLUDING AMERICAN SAMOA.

The Citizenship Clause of the Fourteenth Amendment to the U.S. Constitution provides that "[a]ll persons born . . . in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."  U.S. Const., amend. XIV, § 1, cl. 1.  Thus, as the district court acknowledged, the "key question" in this case is "whether American Samoa qualifies as a part of the 'United States' as that [phrase] is used within the Citizenship Clause."  JA46.

A proper interpretation of the Citizenship Clause requires careful analysis of its text and the original understanding of its Framers.  "When interpreting a constitutional provision," this Court "look[s] to the natural meaning of the text as it would have been understood at the time of [its] ratification."  *Noel Canning v. NLRB*, 705 F.3d 490, 500 (D.C. Cir. 2013) (interpreting Recess Appointments Clause), *cert. granted*, 133 S. Ct. 2861 (2013).[7]  "Constitutional rights are enshrined with the scope they were understood to have when the people adopted

---

[7] This Court's decision in *Noel Canning* is relevant here only for its approach to interpreting the meaning of constitutional provisions.  The Supreme Court's forthcoming decision in that case should not affect how this Court decides the constitutional questions presented here.

them, whether or not future legislatures or (yes) even future judges think that scope too broad." *District of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008) (interpreting Second Amendment), *aff'g Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007).

The Citizenship Clause is "to be interpreted in light of pre-existing common-law principles governing citizenship." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 159 n.10 (1963). Under the common law doctrine of *jus soli* (*i.e.*, "rule of the soil"), "birth within the limits of the jurisdiction of the Crown, and of the United States, as the successor of the Crown, fixed nationality . . . ." *Weedin v. Chin Bow*, 274 U.S. 657, 660 (1927). The Clause constitutionalized *jus soli*, putting the rule beyond legislative amendment, and thus "affirms the ancient and fundamental rule of citizenship by birth *within the territory*, in the allegiance and under the protection of the country . . . ." *Wong Kim Ark*, 169 U.S. at 693 (emphasis added).

The district court "ignor[ed] the historical reality that the [Citizenship Clause] was not intended to lay down a novel principle but rather codified a right inherited from our English ancestors." *See Heller*, 554 U.S. at 599 (quotation marks and brackets omitted). Instead, the district court relied on non-binding cases and non-authoritative opinions, all of which were issued long after the Clause's enactment, and all of which were legally flawed, distinguishable, or both.

16

The Citizenship Clause's "structure, its history, and the authoritative interpretations by [the Supreme] Court," *see Alden v. Maine*, 527 U.S. 706, 713 (1999) (evaluating constitutional scope of state sovereign immunity), confirm that American Samoa is part of "the United States" within the Clause's meaning. Therefore, Plaintiffs are citizens of the United States, and all statutes, policies, and practices to the contrary—including INA § 308(1), 7 FAM § 1125.1(b) and (d), and Defendants' placement of Endorsement Code 09 in Plaintiffs' U.S. passports—are unconstitutional.

###    A.    The Text And Original Understanding Of The Citizenship Clause Confirm That "The United States" Includes American Samoa.

The Citizenship Clause's reference to birth "in the United States" was originally understood to mean birth in any part of the United States—whether States, Territories, or the District of Columbia—where the government exercises unconditional sovereignty. *First*, the natural meaning of the Clause's text and "the structure of the Constitution," *see Noel Canning*, 705 F.3d at 500, 508, confirm that "the United States," as used in the Clause, refers to more than just the States alone. *Second*, the Clause's "constitutional history"—as reflected by "the proceedings of the Congress that authored the provision," *Parker*, 478 F.3d at 390, and a closely related statute that was the "model" for the Citizenship Clause, *see Noel Canning*, 705 F.3d at 501—confirms that the Reconstruction Congress understood birth in "the United States" to encompass birth in the Territories.

17

*Third*, the Supreme Court's "authoritative interpretations" of the Clause in the years soon after its enactment, *Alden*, 527 U.S. at 713; *cf. Noel Canning*, 705 F.3d at 501, confirm that citizenship attaches at birth throughout the nation's territorial limits, States and Territories alike.

### 1.    The Fourteenth Amendment's text and structure confirm that "the United States" is not limited to the States alone.

The phrase "the United States," as used in the Citizenship Clause, had "a natural meaning . . . understood at the time of the [Fourteenth Amendment's] ratification." *See Noel Canning*, 705 F.3d at 500.  That meaning encompassed the entire Union—States, Territories, and the District of Columbia.

As early as 1820, the Supreme Court considered whether the term "the United States" "designate[s] the whole, or any particular portion, of the American Empire[.]"  *Loughborough v. Blake*, 18 U.S. 317, 319 (1820).  Writing for the Court, Chief Justice Marshall explained that "the United States" is "the name given to our great republic, which is composed of States and territories."  *Id.* Accordingly, "[t]he district of Columbia, or the territory west of the Missouri, is not less within the United States, than Maryland or Pennsylvania."  *Id.*  The Reconstruction Congress was well aware of *Loughborough*.  *See, e.g.*, Charles E. Littlefield, *The Insular Cases (II: Dred Scott v. Sandford)*, 15 Harv. L. Rev. 281, 299 (1901) (quoting letter from Senator Henderson, who proposed the original resolution that became the Thirteenth Amendment: "In 1864 . . . [e]ach member [of

Congress] knew and properly respected the old and revered decision in the *Loughborough-Blake* case, which had long before defined the term 'United States.'").

Comparing different sections of the Fourteenth Amendment further confirms that the Citizenship Clause's reference to "the United States" is not limited to the States alone.  In Section 1, the Citizenship Clause uses the expansive phrase "the United States," while Section 2 speaks more narrowly about the apportionment of congressional representation "among *the several States* . . . ."  U.S. Const., amend. XIV, § 2 (emphasis added).  By using the broader phrase "the United States" in Section 1 and the narrower phrase "the several States" in Section 2, the Reconstruction Congress "created a dichotomy" with constitutional significance. *See Noel Canning*, 705 F.3d at 500 (contrasting Recess Appointments Clause's use of "the Recess" and "Session").

### 2. The Reconstruction Congress understood that "the United States" includes Territories.

The expansive scope of the Citizenship Clause's guarantee is also confirmed by the Fourteenth Amendment's historical context, contemporaneous legislation, and the drafting debates themselves.  Most notably, Senator Trumbull, the Judiciary Committee's chairman, explained the significance of the textual dichotomy in the Fourteenth Amendment noted above:  "The second section refers to no persons except those in the States of the Union; but the first section [*i.e.*, the

19

Citizenship Clause] refers to persons *everywhere*, whether in the States *or in the Territories* or in the District of Columbia."  Cong. Globe, 39th Cong., 1st Sess. 2894 (1866) (emphases added).

### a.    The Citizenship Clause's historical context informed its Framers' original understanding.

For eighty years after the signing of the Declaration of Independence, it was understood that although "there [was] no constitutional or congressional provision declaring citizenship by birth," the common law of *jus soli* conferred citizenship upon anyone born within the United States' territorial limits.  *Lynch v. Clarke*, 1 Sand. Ch. 583, 583-84 (N.Y. Ch. 1844).  Then, in 1856, *Dred Scott* repudiated *jus soli* and held instead that no descendant of African slaves, whether born in a State or Territory, could ever be a U.S. citizen.

Working in the aftermath of the Civil War, at a time when almost half of all land in the United States was part of a Territory, members of the Reconstruction Congress sought to stamp out slavery's legacy and safeguard the rights of African-Americans throughout the Union, including its Territories.[8]  But even after the Thirteenth Amendment's ratification in 1865, *Dred Scott* still cast doubt on the basis for U.S. citizenship.  *See, e.g.*, Cong. Globe, 39th Cong., 1st Sess. 2768

---

[8] Of the twenty largest states today, twelve were Territories in 1868, covering over 1.5 million square miles: Alaska, Arizona, Colorado, Idaho, Montana, New Mexico, North Dakota, Oklahoma, South Dakota, Utah, Washington, and Wyoming.

(1866) (Sen. Wade) (expressing concern that a pending proposal for the Fourteenth Amendment did not define "citizen," because "[t]he courts have stumbled on the subject, and even here, at this session, that question has been up and it is still regarded by some as doubtful"). To address this and other issues affecting both States and Territories alike, the Reconstruction Congress sought "changes of the organic law" of the nation in order to "determine the civil rights and privileges of all citizens *in all parts of the republic*." Report of the Joint Committee on Reconstruction xxi (1866) (emphasis added).

The Reconstruction Congress first enacted citizenship legislation in the 1866 Civil Rights Act. It then drafted the Citizenship Clause "to put this question of citizenship and the rights of citizens and freedmen under the civil rights bill beyond the legislative power," Cong. Globe, 39th Cong., 1st Sess. 2896 (1866) (Sen. Howard), and thus "overturn[] the *Dred Scott* decision," *Slaughter-House Cases*, 83 U.S. at 73.

### b. The 1866 Civil Rights Act's text and drafting history confirm that "the United States" includes Territories.

Section 1 of the 1866 Civil Rights Act served as an "initial blueprint" for the Fourteenth Amendment. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 721 (1989). "Many of the Members of the 39th Congress viewed § 1 of the Fourteenth Amendment as 'constitutionalizing' and expanding the protections of the 1866 Act," *id.*, and "[f]requent references to the Civil Rights Act are to be found in the

record of the legislative debates on the adoption of the Amendment," *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 384 (1983) (quotation marks omitted)).  Because the Act was "a basis for the Framers' understanding" of the Citizenship Clause and also "served as the Clause's model," its text and related debates are compelling evidence of the Clause's meaning.  *See Noel Canning*, 705 F.3d at 501 (construing Recess Appointments Clause in light of state constitutional provision that was its likely "model"); *Collins v. Youngwood*, 497 U.S. 37, 43 (1990) (interpreting *Ex Post Facto* Clause in light of state provisions that were a likely "basis for the Framers' understanding" of the Clause).

> Section 1 of the Act provided that

> > *all persons born in the United States* and not subject to any foreign power . . . *are hereby declared to be citizens of the United States; and such citizens . . . shall have the same right, in every State and Territory in the United States*, . . . to full and equal benefit of all laws and proceedings for the security of person and property . . . .

14 Stat. 27, § 1 (1866) (emphases added); *see also, e.g.*, *id.* § 2 ("any State or Territory"); *id.* § 5 ("in the State or Territory").  The Act's text reflects the Reconstruction Congress's view that "the United States" includes both "State[s] and Territor[ies]."  *See id.* § 1.

> The Act's legislative history reinforces this expansive geographic view of "the United States."  Senator Trumbull, the Act's sponsor, explained that Section 1 declared that "birth entitles a person to citizenship, [and] that every free-born

person *in this land* is, by virtue of being born here, a citizen of the United States." Cong. Globe, 39th Cong., 1st Sess. 600 (1866) (emphasis added). The debate in the House similarly reflected the understanding that birthright citizenship would extend throughout the geographical limits of the United States. *See, e.g.*, *id.* at 1832 (Rep. Lawrence) (noting that "as to certain enumerated civil rights every citizen 'shall have the same right in every State and Territory'"). President Andrew Johnson—who vetoed the Act in March 1866, only to be overridden by the Reconstruction Congress two weeks later—likewise acknowledged that the law would "confer the rights of citizens upon all persons of African descent *born within the extended limits* of the United States." *Id.* at 1679 (emphasis added). Similarly, he criticized the Act's "enumeration of the rights to be enjoyed by these classes, so made citizens, 'in every State and Territory in the United States.'" *Id.*

### c. The Citizenship Clause's drafting history confirms that "the United States" includes Territories.

The Reconstruction Congress's well-documented debate on the Citizenship Clause is perhaps most instructive of how it was originally understood. When introducing the Clause in the Senate, its sponsor Senator Howard explained that the provision declared what was "the law of the land already, that every person born *within the limits of the United States*, and subject to their jurisdiction, is by virtue of natural law and national law a citizen of the United States." Cong. Globe, 39th Cong., 1st Sess. 2890 (1866) (emphasis added). The Clause's advocates and

opponents alike recognized its application to Territories.  Most prominently, Senator Trumbull declared that the Clause "refers to persons everywhere, whether in the States, or in the Territories or in the District of Columbia."  *Id.* at 2894; *see also id.* at 2893 (Sen. Johnson) (conceding there is "no better way to give rise to citizenship than the fact of birth within the territory of the United States").

Much of the Senate debate examined whether the Clause would confer birthright citizenship upon Native Americans, many of whom lived in the Territories.  But that issue was limited to whether Native Americans were persons born "subject to the jurisdiction of the United States," given unique issues of tribal sovereignty and allegiance.  *See, e.g.*, Cong. Globe, 39th Cong., 1st Sess. 2890 2893 (1866) (Sen. Trumbull).  No one questioned that Native Americans born in Territories would satisfy the Clause's other requirement for birthright citizenship, birth "in the United States."  *See, e.g.*, *id.* at 2892 (Sen. Doolittle) (disapproving of Clause's application to "the Indians of the Territories," particularly in the then-Territory of Colorado); *id.* at 2893 (Sen. Trumbull) ("If they are there and within the jurisdiction of Colorado, and subject to the laws of Colorado, they ought to be citizens; and that is all that is proposed.").

The district court incorrectly dismissed these unambiguous statements by those who wrote, debated, and enacted the Citizenship Clause, calling them "stray comments."  JA51.  But these supposedly "stray comments" by the Fourteenth

Amendment's Framers are no less important than the statements about the Second Amendment that were given careful consideration by the Supreme Court in *Heller*: the ratification debates among Federalists and Anti-Federalists, and even commentary on the Second Amendment by the Reconstruction Congress itself. *See* 554 U.S. at 598-99, 603-05, 616.

### 3.  Authoritative Supreme Court decisions interpret the Citizenship Clause's scope as including Territories.

In the first three decades after the Fourteenth Amendment's ratification, the Supreme Court addressed the Citizenship Clause's scope on three occasions: the *Slaughter-House Cases*, 83 U.S. 36 (1872); *Elk v. Wilkins*, 112 U.S. 94 (1884); and *United States v. Wong Kim Ark*, 169 U.S. 649 (1898).  Each time, the Court interpreted birth "in the United States" as meaning birth within the United States' sovereign geographical limits.  These interpretations by the Court, coming in the years immediately after the Clause's ratification, offer "the most instructive historical analysis in discerning the original meaning."  *See Noel Canning*, 705 F.3d at 501; *see also Alden*, 527 U.S. at 713.  The district court erred by ignoring the *Slaughter-House Cases* and by improperly distinguishing *Wong Kim Ark*.

In 1872, just four years after the Fourteenth Amendment was ratified, the Court recognized in the *Slaughter-House Cases* that the Citizenship Clause finally "put[] at rest" the argument that "[t]hose . . . who had been born and resided always in the District of Columbia or in the Territories, though *within the United*

*States*, were not citizens." 83 U.S. at 72-73 (emphasis added). Twelve years later, the Court similarly observed in *Elk v. Wilkins* that Native Americans "born within the territorial limits of the United States" are "in a geographical sense born in the United States," although they were not born "subject to the jurisdiction thereof" if born in allegiance to a tribal government.[9] 112 U.S. at 102. And barely a year before American Samoa became a Territory, the Court's most authoritative examination of the Citizenship Clause, *Wong Kim Ark*, held that the Citizenship Clause constitutionalized the common law principle of *jus soli*, conferring citizenship by birth "within the dominion of" or "within the limits of" the United States. 169 U.S. at 688; *see also Weedin*, 274 U.S. at 670 (explaining that *Wong Kim Ark* "held that the fundamental principle" of *jus soli* was "embodied in the [Fourteenth] Amendment").

In *Wong Kim Ark*, the Court concluded that the Clause barred Congress from denying the citizenship of a person of Chinese descent who was born in California. The Court first explained that because the Constitution "nowhere define[d] the meaning of" the phrase "citizen of the United States," it must be "interpreted in the

---

[9] The *Elk* petitioner was a Native American born in what was then the Iowa Territory. *See* Anna Williams Shavers, *A Century of Developing Citizenship Law and the Nebraska Influence: A Centennial Essay*, 70 Neb. L. Rev. 462, 480 (1991) (citing Census records). The Supreme Court's opinion did not discuss his birthplace. But if his claim of birthright citizenship had been foreclosed by birth in a Territory, it is hard to see why the Court or the litigants would leave the issue unaddressed.

light of the common law, the principles and history of which were familiarly known to the framers of the Constitution." *Wong Kim Ark*, 169 U.S. at 654. After exhaustively reviewing the common law of England and the United States, the Court held that "the fundamental principle of citizenship by *birth within the dominion* was reaffirmed in the most explicit and comprehensive terms" by both the 1866 Civil Rights Act and the Citizenship Clause. *Id.* at 675 (emphasis added).

Next, looking to the *Slaughter-House Cases*, *Elk*, and other judicial decisions about the scope of territorial sovereignty, the Court interpreted the phrase "in the United States" as "the equivalent of the words '*within the limits* . . . of the United States,' and the converse of the words, '*out of the limits* . . . of the United States,' as habitually used in the naturalization acts." *Id.* at 687 (emphases added). These early naturalization acts had used the phrase "within the limits of the United States" when requiring citizenship applicants to "first acquire[] a residence within some state *or territory* of the United States." *Anonymous* (*In re Naturalization Petition*), 1 F. Cas. 1016, 1017 (S.D.N.Y. 1846) (emphasis added). *See, e.g.*, Naturalization Act of 1795, 1 Stat. 414, § 1, ¶¶ 2-3 (conditioning naturalization upon five years' residence "within the limits and under the jurisdiction of the United States," including one year "within the state or territory" where petition was to be heard); Naturalization Act of 1798, 1 Stat. 566, § 1 (similar but extending residency requirements).

27

As a long-held Territory, American Samoa is plainly "within the limits" rather than "out of the limits" of the United States. This appears undisputed here, as does the fact that persons born in America Samoa are "subject to" U.S. jurisdiction. *See* JA46. Therefore, under the *jus soli* rule codified by the Citizenship Clause and confirmed by *Wong Kim Ark*, this is, and should be, the end of the matter.

But the district court declined to apply *Wong Kim Ark*. It concluded that because that case's petitioner was born in California, the Supreme Court "did not need to address the territorial scope of the Citizenship Clause in that case." JA50-51. This cannot be squared with the fact that *Wong Kim Ark* held that the Clause codified the pre-existing rule of *jus soli*. That rule made no distinction between States and Territories, and focused only on the geographical limits of the nation's "dominion"—which, when *Wong Kim Ark* was decided, was understood to include the Territories. *See, e.g.*, *Nat'l Bank v. County of Yankton*, 101 U.S. 129, 133 (1880) ("The Territories are but political subdivisions of the outlying dominion of the United States.").

Even if the district court considered *Wong Kim Ark*'s statements about the Citizenship Clause's scope to be *dicta*, the court was not free to so quickly dismiss them. After all, "carefully considered language of the Supreme Court, even if technically *dictum*, generally must be treated as authoritative." *Overby v. Nat'l*

28

*Ass'n of Letter Carriers*, 595 F.3d 1290, 1295 (D.C. Cir. 2010).  Such treatment is "especially" appropriate where, as here, "the Supreme Court . . . reiterated the same teaching," *see id.*, both before and after *Wong Kim Ark*.  *See Slaughter-House Cases*, 83 U.S. at 72-73; *Elk*, 112 U.S. at 102; *Weedin*, 274 U.S. at 670.

### B.    The District Court Relied On Authorities That Do Not Supersede The Original Understanding Of The Citizenship Clause.

Instead of focusing on the Citizenship Clause's text and original understanding in order to determine "whether American Samoa qualifies as part of the 'United States,'" JA46, the district court improperly relied on a single Justice's flawed individual opinion in a Supreme Court case that did not concern the Citizenship Clause, incorrectly reasoned and factually distinguishable lower court decisions, and congressional practice beginning half a century after the Clause was ratified.  JA47-51.  None of these grounds supports reading the Citizenship Clause to exclude people born in American Samoa from its guarantee of birthright citizenship.

### 1.    The *Insular Cases* do not govern this case.

In dismissing Plaintiffs' authorities, the district court focused its analysis on the *Insular Cases*, a collection of Supreme Court decisions from the early 1900s concerning newly acquired Territories.  JA47.  But as even the district court acknowledged, "none of the *Insular Cases* directly addressed the Citizenship

Clause." JA47. Moreover, none of the holdings or opinions from any of the *Insular Cases* are even persuasive authority for interpreting the Clause.

### a. The *Insular Cases* did not concern the Citizenship Clause.

The *Insular Cases* addressed new questions about Congress's authority to govern Territories in the wake of the Spanish-American War of 1898 and the United States' overseas territorial expansion. The *Insular Cases*—none of which involved American Samoa—primarily addressed the former Spanish territories and examined only two aspects of territorial administration: revenue collection[10] and criminal procedure.[11] None of the *Insular Cases* concerned the Citizenship Clause's meaning or its application to any Territory, newly acquired or otherwise.[12]

---

[10] *See De Lima v. Bidwell*, 182 U.S. 1 (1901); *Goetze v. United States*, 182 U.S. 221 (1901); *Dooley v. United States*, 182 U.S. 222 (1901); *Armstrong v. United States*, 182 U.S. 243 (1901); *Downes v. Bidwell*, 182 U.S. 244 (1901); *Huus v. N.Y. & Porto Rico Steamship Co.*, 182 U.S. 392 (1901); *Dooley v. United States*, 183 U.S. 151 (1901); *Fourteen Diamond Rings v. United States*, 183 U.S. 176 (1901).

[11] *See Hawaii v. Mankichi*, 190 U.S. 197 (1903); *Dorr v. United States*, 195 U.S. 138 (1904); *Kepner v. United States*, 195 U.S. 100 (1904); *Mendozana v. United States*, 195 U.S. 158 (1904); *Trono v. United States*, 199 U.S. 521 (1905); *Grafton v. United States*, 206 U.S. 333 (1907); *Rassmussen v. United States*, 197 U.S. 516 (1905); *Kent v. Porto Rico*, 207 U.S. 113 (1907); *Kopel v. Bingham*, 211 U.S. 468 (1909); *Dowdell v. United States*, 221 U.S. 325 (1911); *Ocampo v. United States*, 234 U.S. 91 (1914); *Balzac v. Porto Rico*, 258 U.S. 298 (1922).

[12] In *Gonzales v. Williams,* 192 U.S. 1 (1904)—another decision sometimes grouped with the *Insular Cases*—the Supreme Court held that a person entering New York from the U.S. Territory of Puerto Rico, where she was born before it

Footnote continued on next page

The *Insular Cases* "held that the Constitution has independent force in these territories, a force not contingent upon acts of legislative grace." *Boumediene v. Bush*, 553 U.S. 723, 757 (2008). But they also took into account Congress's ability to govern these new Territories pursuant to its longstanding power "to dispose of" or otherwise regulate "the Territory or other Property belonging to the United States." U.S. Const., art. IV, § 3, cl. 2; *see also Rasul v. Myers*, 563 F.3d 527, 532 (D.C. Cir. 2009). Thus, these decisions examined how Congress's historically broad Property Clause power to create territorial governments would apply to newly acquired Territories "with wholly dissimilar traditions and institutions," *Reid v. Covert*, 354 U.S. 1, 14 (1957) (plurality op.), particularly "the former Spanish colonies[, which] operated under a civil-law system, without experience in the various aspects of the Anglo-American legal tradition," *Boumediene*, 553 U.S. at 757.

To avoid a disruptive "transformation of the prevailing legal culture" through the immediate institution of common law governance, *id.* at 757, the *Insular Cases* created and applied a new doctrine of "territorial incorporation" when considering challenges to territorial criminal procedure. *See Dorr v. United*

---

Footnote continued from previous page

became a Territory, was not an "alien" under federal immigration law. The case did not and had no occasion to address birthright citizenship, and the Court expressly declined to address the questions that *were* presented about *naturalized* citizenship upon Puerto Rico's cession to the United States. *See id.* at 12.

*States*, 195 U.S. 138 (1904). In order to account for "[p]ractical considerations," this new doctrine distinguished between "incorporated Territories surely destined for statehood" and "unincorporated Territories" that were not, thus allowing the Supreme Court "to use its power sparingly and where it would be most needed." *Boumediene*, 553 U.S. at 757, 759.

Even though the *Insular Cases* never had occasion to examine the Citizenship Clause, the decision below extended the territorial incorporation doctrine to this case. Although the district court acknowledged that the Clause's drafting history frequently "include[d] people in the 'Territories' within the bounds of the Citizenship Clause," it reasoned that "it is unclear from this language whether the 'Territories' included only incorporated territories on the path to statehood or also unincorporated territories—particularly unincorporated territories such as American Samoa that had not yet come into existence." JA51. This reasoning rests on three faulty premises.

First, any distinction between "incorporated" and "unincorporated" Territories was unknown to the Citizenship Clause's Framers. These are judicially created labels that emerged four decades *after* the Fourteenth Amendment's ratification. The Framers' concern was to codify the ancient rule of *jus soli* and confer citizenship upon anyone born within the United States' "territory" or "dominion," broadly understood. *See supra* § I.A.2.

32

Second, any deference due to Congress under the *Insular Cases* framework is grounded in Congress's Article IV power to govern Territories as federal "Property." But people are not property. Whatever power the Property Clause conferred upon Congress when the Constitution was ratified, the Fourteenth Amendment's ratification eight decades later permanently withdrew Congress's power to regulate or otherwise restrict the citizenship of persons born within the geographical limits of the United States. As the Supreme Court later explained: "Th[e] undeniable purpose of the Fourteenth Amendment to make citizenship . . . permanent and secure would be frustrated by holding that the Government can rob a citizen of his citizenship without his consent by simply proceeding to act under an implied general power to regulate foreign affairs or some other power generally granted." *Afroyim v. Rusk*, 387 U.S. 253, 263 (1967).

Third, the *Insular Cases*' concern for transitioning new Territories to U.S. jurisdiction lacked the same force in American Samoa when it became a Territory. Even in 1900, American Samoa's legal system *was already informed* by "various aspects of the Anglo-American legal tradition." *Boumediene*, 553 U.S. at 757. Beginning in 1889, a decade *before* American Samoa's cession, the United States worked with other nations to help establish a Samoan supreme court to decide civil disputes and various criminal matters under English "practice and procedure of common law, equity, and admiralty," unless otherwise "required by local

33

circumstances."   General Act of the Conference at Berlin, art. III, § 10 (1889)

(reprinted in U.S. Dep't of State, Foreign Relations of the United States 353-64

(1889)).[13]   In 1899, the other nations ceded to the United States all rights and

claims to the eastern Samoan islands, including Tutuila, *see* Tripartite Convention,

art. II, Dec. 2, 1899, 31 Stat. 1878, giving the United States "exclusive

sovereignty" and "control" over Tutuila from that point forward.  *See* 23 U.S. Op.

Atty. Gen. 629, 629-30 (Feb. 17, 1902).

> **b.    The district court incorrectly relied on Justice Brown's individual comments about citizenship in *Downes v. Bidwell*.**

The district court erred by mistaking Justice Brown's individual opinion in

*Downes v. Bidwell*, 182 U.S. 244, 247-87 (1901) (Brown, J., for himself), for a

precedential opinion of the full Supreme Court.  It then compounded that error by

favoring that individual opinion over the text and history of the Citizenship Clause

as well as the Supreme Court's authoritative interpretation of the Clause in *Wong

Kim Ark* and other cases.

In *Downes*, the Supreme Court held that the Revenue Clause, which required

uniformity of duties "throughout the United States," U.S. Const., art. I, § 8, cl. 2,

was not violated by the special imposition of duties on oranges shipped from

---

[13] *Available at* http://books.google.com/books?id=ynQWAAAAYAAJ&pg=
PA353.

Puerto Rico to New York. The district court misread *Downes*, erroneously asserting that "[i]n *an opinion for the majority*, Justice Brown intimated in *dicta* that citizenship was not guaranteed to unincorporated territories." JA48 (emphasis added). This is incorrect, as Plaintiffs advised below.

Justice Brown's opinion spoke *only* for himself. *Downes* was decided by an unusually fragmented Court. As explained in the decision's U.S. Reports edition, Justice Brown "announc[ed] the conclusion and judgment of the court," but "there [was] no opinion in which a majority of the court concurred." 182 U.S. at 244 n.1. In fact, Justice Brown's opinion failed to win *any* other Justice's support. *See, e.g.*, L.S. Rowe, *The Supreme Court and the Insular Cases*, 18 Annals Am. Acad. Pol. & Soc. Sci. 38, 47 (1901) ("Mr. Justice Brown stands alone, the other eight Justices being equally divided."). His opinion has no "controlling force" in this or any other case, because "eight of nine Justices d[id] not subscribe to [his] given approach to [the] legal question" before the Court. *See King v. Palmer*, 950 F.2d 771, 782 (D.C. Cir. 1991) (*en banc*).[14]

Moreover, Justice Brown's comments about citizenship are inapposite, unpersuasive, and contrary to the original understanding of the Fourteenth

---

[14] Notwithstanding the reporter's express clarification in footnote 1 of the U.S. Reports edition of *Downes* that there was no majority opinion, confusion appears to have arisen from the printer's erroneous use of the caption "Opinion of the Court" on the pages of Justice Brown's opinion.

Amendment.  The district court favorably cited Justice Brown's "suggesti[on] that citizenship . . . [is] 'unnecessary to the proper protection of individuals.'"  JA48 (quoting 182 U.S. at 282).  But that suggestion ignores that the "undeniable" purpose of the Citizenship Clause was "to put citizenship beyond the power of any governmental unit to destroy."  *Afroyim*, 387 U.S. at 263; *see also infra* § II.A.

The district court also favorably cited Justice Brown's view that Congress would never agree to acquire Territories if this meant conferring citizenship "at once" upon territorial inhabitants from foreign cultures.  *See* JA48 (quoting *Downes*, 182 U.S. at 279-80).  Putting aside the merits of Justice Brown's view, the phrase "at once" indicates that he was addressing the separate and distinct question of whether people born under foreign rule would be immediately *naturalized* as citizens upon the acquisition of their land, and not whether any children born in that land once it came under permanent U.S. jurisdiction and sovereignty could claim *birthright* citizenship.[15]

---

[15] The district court also conflated naturalization and birthright citizenship when citing Justice White's concurrence in *Downes* as having "argu[ed] that the practice of acquiring territories 'could not be practically exercised if the result would be to endow the inhabitants with citizenship of the United States.'"  JA48 (quoting 182 U.S. at 306 (White, J., concurring in the result)).  The rest of Justice White's quoted sentence shows he too spoke only about "the immediate bestowal of citizenship"—*i.e.*, naturalization—upon an entire territorial people.  *See* 182 U.S. at 306.

Justice Brown's ahistorical views certainly do not outweigh *Wong Kim Ark* and other cases where the Supreme Court had reason to, and actually did, interpret the Citizenship Clause and assess its original understanding.  *See supra* § I.A.3.

### 2. The Thirteenth Amendment does not narrow the scope of "the United States" as used in the Fourteenth Amendment.

The district court also relied on Justice Brown's statement in *Downes* that a comparison of the Thirteenth and Fourteenth Amendments suggests that the Fourteenth Amendment's phrase "the United States" excludes Territories.  JA48.  Justice Brown's cursory analysis ignores the original understanding of both Amendments.

The Thirteenth Amendment provides that "[n]either slavery nor involuntary servitude . . . shall exist within the United States, *or any place* subject to their jurisdiction."  U.S. Const., amend. XIII, § 1 (emphasis added).  The Fourteenth Amendment guarantees citizenship to "[a]ll persons born . . . in the United States, and subject to the jurisdiction thereof."  *Id.*, amend. XIV, § 1.  The natural reading of both Amendments is that both use "the United States" to refer to places *within* U.S. territorial limits: States, Territories, and the District of Columbia.  But while the Fourteenth Amendment's scope ends there, the Thirteenth Amendment goes further and prohibits slavery even in "any place" *beyond* those territorial limits but still within U.S. jurisdiction, such as American vessels outside territorial waters, embassies abroad, and military installations on foreign soil.  *See, e.g.*, *In re Chung*

*Fat*, 96 F. 202, 203-04 (D. Wash. 1899) (Thirteenth Amendment was violated by coercing petitioners "to labor on board an American vessel against their will").

This construction is consistent with the Reconstruction Congress's intent for both Amendments. The Fourteenth Amendment codified the existing common law of *jus soli*, which applied only up to the Union's territorial limits. *See supra* § I.A.2. By contrast, the Reconstruction Congress gave the Thirteenth Amendment the broadest possible geographical scope to avoid any ambiguity and stamp out the American institution of slavery forever, even in places *beyond* the Union's territorial limits.

In January 1864, as the Civil War raged, Senator Henderson of Missouri introduced the proposal that eventually became the Thirteenth Amendment: "Slavery or involuntary servitude, except as punishment for a crime, shall not exist *in the United States*." Cong. Globe, 38th Cong., 1st Sess. 145, 1313 (1864) (emphasis added). Senator Trumbull, the Judiciary Committee's Chairman, understood that proposal's reference to "the United States" as seeking to "prohibit slavery *everywhere within [the United States'] territorial limits.*" *Id.* at 521 (emphasis added). After some modification and the addition of the broadening phrase "or any place subject to the jurisdiction thereof," the Senate Judiciary Committee adapted Senator Henderson's original proposal into the final text of the Thirteenth Amendment. *See id.* at 1313; *see also id.* at 553 (Sen. Trumbull)

(noting Committee's amendment of Senator Henderson's resolution).  This broader "any place" language helped guarantee that the Amendment would, as Senator Trumbull stated when urging passage, "abolish slavery *everywhere*" by "forever prohibiting it *within the jurisdiction of the United States*."  Cong. Globe, 38th Cong., 1st Sess. 1314 (1864) (emphases added).

In 1901, Senator Henderson himself criticized Justice Brown's reading in *Downes* of the Thirteenth Amendment's "any place" provision: "Whatever else these words may refer to, they surely were not intended to embrace or refer to the territories of the United States," but rather included military installations and any portions of Confederacy that might return to the Union's jurisdiction as the Civil War wound down.  Littlefield, *supra*, at 299, 301 (quoting Senator Henderson's letter to the author).

The distinction between the two Amendments' geographic scope is illustrated by the historical example of American Samoa itself.  In 1878, the United States entered a Treaty of Friendship and Commerce with the native Samoan government, which granted the United States the right to build a naval and coaling station at Tutuila's port of Pago Pago, as well as exclusive jurisdiction over that station.  *See* 20 Stat. 704 (Jan. 17, 1878).  The Thirteenth Amendment's prohibition on slavery took immediate effect at the station upon its opening.  *See also* Littlefield, *supra*, at 298-301 (quoting Senator Henderson's explanation that

39

Thirteenth Amendment's "any place" provision was "necessary" because U.S. strategic interests during and after Civil War required establishing "naval and coaling stations outside the United States," including at "the harbor of Pago Pago," yet such stations "might be obtained in slaveholding territory"). But the Fourteenth Amendment's Citizenship Clause did not apply there until 1900, when the American flag was raised over Pago Pago and Tutuila became part of American Samoa, subject to the United States' exclusive sovereignty and jurisdiction.

Justice Brown took a different, strained approach when interpreting the Thirteenth and Fourteenth Amendments. He first concluded that the Thirteenth Amendment's reference to "any place subject to" U.S. jurisdiction proved that "there may be places within the jurisdiction of the United States that are no part of the Union." *Downes*, 182 U.S. at 251 (Brown, J., for himself). This much is true, as shown by the examples of American vessels on the high seas and U.S. military bases abroad. But Justice Brown then jumped to the unsupported conclusion that *the Territories* must be these "places" outside the Union, such that the Fourteenth Amendment's reference to "the United States" must necessarily exclude insular Territories. Tellingly, Justice Brown did not support this conclusion with any evidence of either Amendment's original understanding. *See also* Littlefield, *supra*, at 299 (quoting Senator Henderson, who criticized Justice Brown's *Downes* analysis as "clearly defective, and the difficulties of construction suggested by

[Justice Brown] would have disappeared with a better knowledge of the history of the [Thirteenth A]mendment and the peculiar circumstances attending its adoption"). Nor did Justice Brown consider the textual distinction *within* the Fourteenth Amendment's Sections 1 and 2. *See supra* § I.A.1. Such thin reasoning is unpersuasive and does not warrant disregarding the text, history, and authoritative interpretations of the Citizenship Clause.

### 3. The district court's other cited authorities do not control this case.

The district court also relied on lower court decisions that examined the Citizenship Clause's application to persons born in the Philippines while the United States held it from 1898 until 1946, as well as a lower court decision examining the Naturalization Clause's application to the Northern Mariana Islands. JA50-51. "Those courts, however, did not focus their analyses on the original public meaning" of the Citizenship Clause. *See Noel Canning*, 705 F.3d at 509. These decisions are also distinguishable because of the different factual contexts in which they were decided.[16]

Directly or indirectly, each of these decisions misread Justice Brown's individual opinion in *Downes* as the Supreme Court's binding opinion, and then

---

[16] The district court also cited a footnote from *Barber v. Gonzales*, 347 U.S. 637, 639 n.1 (1954), which described certain changes in the statutory status of residents of the Philippines. *Barber* did not consider the Citizenship Clause or any claim of citizenship.

41

relied on Justice Brown's ahistorical, cursory, and erroneous interpretations of the Thirteenth and Fourteenth Amendments. *See Rabang v. INS*, 35 F.3d 1449, 1452-53 (9th Cir. 1994) (Philippines); *Valmonte v. INS*, 136 F.3d 914, 918 (2d Cir. 1998) (Philippines); *Lacap v. INS*, 138 F.3d 518, 519 (3d Cir. 1998) (*per curiam*) (Philippines); *Nolos v. Holder*, 611 F.3d 279, 282-83 (5th Cir. 2010) (*per curiam*) (Philippines); *Licudine v. Winter*, 603 F. Supp. 2d 129, 134-35 (D.D.C. 2009) (Philippines); *Eche v. Holder*, 694 F.3d 1026, 1031 (9th Cir. 2012) (Northern Marina Islands).[17]  This flawed analysis—no matter how often repeated—cannot supersede the original meaning of the Citizenship Clause as reflected by its text, structure, and history.  Nor can it override the Supreme Court's authoritative interpretations of the Clause in cases such as *Wong Kim Ark*.

The Philippines cases are also factually distinguishable.  Those islands were acquired by conquest in 1898, and from the start, "the United States intended to grant independence to that Territory."  *Boumediene*, 553 U.S. at 757 (citing 1916 federal statute providing that "it is, as it has always been, the purpose of the people of the United States to withdraw their sovereignty over the Philippine Islands and

---

[17] This Court was confronted with similar questions in *Mendoza v. Social Security Commissioner*, 92 F. App'x 3 (D.C. Cir. 2004) (*per curiam*), but avoided the constitutional issue.  *Mendoza* affirmed the denial of benefits to a petitioner who argued that her deceased husband was a U.S. citizen because he had been born in the Philippines when it was a U.S. Territory.  The Court assumed *arguendo* that her husband had been "a citizen of the United States within the meaning of the Citizenship Clause," and instead affirmed the denial on statutory grounds.  *Id.* at 3.

to recognize their independence as soon as a stable government can be established therein"). The Philippines achieved independence in 1946 after decades of planning, giving effect to the Philippines Independence Act of 1934 and "sever[ing] the obligation of permanent allegiance owed by Filipinos" to the United States. *Rabang v. Boyd*, 353 U.S. 427, 430 (1957). As a result, "persons born in the [Philippine] Islands . . . became aliens on July 4, 1946." *Id.* at 430-31.

By contrast, in the words of putative intervenor Congressman Faleomavaega, "American Samoa, through the mutual and voluntary agreement of [its] leaders, joined the United States by Treaties of Cession negotiated and executed in 1900 and 1904." Stmt. of the Hon. Eni F.H. Faleomavaega Before the U.N. Special Comm. on Decolonization, Havana, Cuba (May 23, 2001).[18] Moreover, "[t]he people of American Samoa treasure their relationship with the United States, are immensely proud to be part of the U.S. political family, and have not requested that [their] status as a U.S. territory be changed in any way." *Id*.

In short, what the Constitution guarantees to someone born in a place like American Samoa, which voluntarily joined the United States and has remained under its sovereignty for 114 years, does not present the same question as what the Constitution requires for a person born in a place such as the Philippines, which

---

[18] *Previously available at* http://www.house.gov/list/speech/as00_faleomavaega/ undecolonization.html; *currently available at* https://web.archive.org/web/ 20120702002618/http://www.house.gov/list/speech/as00_faleomavaega/undecolon ization.html.

has been independent for almost 70 years and which the United States acquired by conquest and never intended to hold permanently.

The district court also misread the Ninth Circuit's decision in *Eche v. Holder* as "holding" that the current Territory of the Northern Mariana Islands "is not included within the bounds of the Citizenship Clause." JA51. In fact, *Eche* concerned the *Naturalization* Clause, holding that its requirement that Congress "establish a uniform Rule of Naturalization . . . throughout the United States," U.S. Const., art. I, § 8, cl. 4, did not apply to the Northern Mariana Islands. 694 F.3d at 1031. The *Eche* court's analogy of the Naturalization Clause to the Citizenship Clause was erroneous, both because it relied on the Philippines cases discussed above and repeated their flawed reading of Justice Brown's individual opinion in *Downes*, *see id.*, and because it overlooked the separate original understandings of the Naturalization Clause and Citizenship Clause, ratified eight decades apart.[19]

---

[19] The district court also relied on a dissenting opinion by Justice Ginsburg in *Miller v. Albright*, where she observed that the statutory distinction between "nationals" and "citizens" "has little practical impact today," because "the only remaining noncitizen nationals" are American Samoans. 523 U.S. 420, 467 n.2 (1998). Although the district court was correct that Justice Ginsburg did not "note anything objectionable about their noncitizen national status," JA49, she had no reason or occasion to do so, because *Miller* did not concern constitutional birthright citizenship.

### 4. Later Congresses' practice cannot alter the Citizenship Clause's meaning.

The district court also cited Congress's supposedly "longstanding practice" in the twentieth century of recognizing citizenship by statute in overseas Territories as evidence that the Citizenship Clause does not extend to those areas. JA53. If this conclusion were correct, and Congress could define for itself how its own powers are constrained by the Clause, it would "wholly defeat the purpose of the Framers." *See Noel Canning*, 705 F.3d at 503.

"[P]ractice of a more recent vintage is less compelling than historical practice dating back to the era of the Framers." *Noel Canning*, 705 F.3d at 502. Whatever Congress believed about the Citizenship Clause fifty years or more after the Fourteenth Amendment was ratified, it cannot rewrite "the scope [the Citizenship Clause was] understood to have when the people adopted [it]." *See Heller*, 554 U.S. at 634-35. The original understanding of the Citizenship Clause in the time closer to its ratification—as reflected in the *Slaughter-House Cases*, *Elk*, and *Wong Kim Ark*, and by "well considered opinions" of the Executive Branch, *see Wong Kim Ark*, 169 U.S. at 688-92—is that the Citizenship Clause applies to individuals born in the States and Territories alike.

The mere fact that the political branches *treat* persons born in American Samoa as if they were not born in "the United States" for purposes of the Citizenship Clause cannot determine whether the Clause *actually* includes

45

American Samoa within its scope.  "[T]he protection afforded to the citizen by the Citizenship Clause . . . is a limitation on the powers of the National Government as well as the States."  *Saenz v. Roe*, 526 U.S. 489, 507-08 (1999).  "[N]o act or omission of Congress . . . can affect citizenship acquired as a birthright, by virtue of the Constitution itself . . . .  The [F]ourteenth [A]mendment, while it leaves the power, where it was before, in [C]ongress, to regulate naturalization, has conferred no authority upon [C]ongress to restrict the effect of birth, declared by the [C]onstitution to be a sufficient and complete right to citizenship."  *Wong Kim Ark*, 169 U.S. at 703.

## II.   THE CONSTITUTION'S GUARANTEE OF BIRTHRIGHT CITIZENSHIP APPLIES IN AMERICAN SAMOA WHETHER OR NOT IT IS AN "UNINCORPORATED" TERRITORY.

The district court erred by applying the *Insular Cases* framework to answer "whether American Samoa qualifies as a part of the 'United States' as that is used within the Citizenship Clause."  JA47-48.  As discussed, Congress's Property Clause power to administer Territories is constrained by the Citizenship Clause's protection against political interference with an individual's birthright.  But even assuming *arguendo* that Congress's authority over territorial governance should be balanced against the Constitution's individual guarantee of birthright citizenship, the district court failed to undertake the necessary balancing.  Its expansive and inflexible application of the *Insular Cases* framework is contrary to this Court's

precedent in *King v. Morton*, 520 F.2d 1140, and in tension with the Supreme Court's more recent decision in *Boumediene*, 553 U.S. 723.   Under *King* and *Boumediene*, the *Insular Cases* stand for a context-sensitive application of constitutional procedural rights that affect territorial governance.   *See King v. Andrus*, 452 F. Supp. 11 (D.D.C. 1977) (recognizing right to jury trial in American Samoa), *on remand from King*, 520 F.2d 1140.  Even under this Court's analytical framework in *King*, birthright citizenship would apply in American Samoa, whether or not it is an "unincorporated" Territory.

The *Insular Cases* framework presents a two-step inquiry.   First, if a particular constitutional right is "fundamental," it applies in "incorporated" and "unincorporated" Territories alike.   *King*, 520 F.2d at 1146-47; *see also Boumediene*, 553 U.S. at 758-59.   Second, even absent a finding that a right is "fundamental," a constitutional right will be recognized in an "unincorporated" Territory if it is not "impractical and anomalous" for the right to apply there.  *King*, 520 F.2d at 1147.

Neither prong permits denying birthright citizenship to persons born in American Samoa.   First, the Supreme Court has repeatedly emphasized the fundamental and inviolable nature of citizenship, particularly birthright citizenship. Centuries of tradition confirm that it is among the *most* fundamental rights in our

system of government.  Second, recognizing birthright citizenship would not be "impractical and anomalous" in American Samoa.

At a minimum, this Court's decision in *King* required the district court to assess, based on "an adequate factual record," "whether in American Samoa circumstances are such" that birthright citizenship "would be impractical and anomalous."  *See* 520 F.2d at 1147-48 (quotation marks omitted).  The district court failed to do so.

### A.     Birthright Citizenship Is A Fundamental Right.

"[G]uaranties of certain fundamental personal rights declared in the Constitution" apply in all Territories.  *Boumediene*, 553 U.S. at 758 (quoting *Balzac v. Porto Rico*, 258 U.S. 298, 312-13 (1922)).  The district court erred in rejecting the argument that the Fourteenth Amendment's guarantee of citizenship is a "fundamental" right in American Samoa.

Citizenship by birth within the sovereign's dominion is a cornerstone of our common law tradition that predates the United States itself.  In *Wong Kim Ark*, the Supreme Court undertook a comprehensive examination of the common law, concluding that "[t]he Fourteenth Amendment affirms the ancient and *fundamental rule* of citizenship by *birth within the territory*, in the allegiance and under the protection of the country . . . ."  169 U.S. at 693 (emphases added); *see also id.* at 655 (reviewing English common law and concluding that "[t]he *fundamental*

*principle* of the common law" that English nationality applied to "*all persons* born within the king's allegiance, and subject to his protection" (emphases added)); *id.* at 674 (concluding that early U.S. history supported "[t]he *fundamental rule* of citizenship by *birth within [the United States'] sovereignty*" (emphases added)); *id.* at 688 (reviewing post-Civil War court decisions and executive practice that affirmed "the *fundamental rule* of citizenship by *birth within the dominion* of the United States" (emphases added)).

Decades later, the Supreme Court reinforced the fundamental importance of citizenship through a series of decisions that limited Congress's ability to abrogate citizenship by legislative act.  On four separate occasions, the Court invalidated federal laws that purported to divest individuals of their birthright or naturalized citizenship, emphasizing the importance and sanctity of the citizenship right.  *See Afroyim*, 387 U.S. at 267-68 (invalidating expatriation statute under Citizenship Clause because "[c]itizenship is no light trifle to be jeopardized any moment Congress decides to do so under the name of one of its general or implied grants of power"); *Schneider v. Rusk*, 377 U.S. 163, 167-69 (1964) (invalidating expatriation statute on equal protection grounds because it impermissibly infringed "the most precious right of citizenship" (quotation marks omitted)); *Mendoza-Martinez*, 372 U.S. at 159 (invalidating expatriation statute on due process grounds because "[c]itizenship is a most precious right" that "is expressly guaranteed by the

49

Fourteenth Amendment to the Constitution, which speaks in the most positive terms"); *Trop v. Dulles*, 356 U.S. 86, 103 (1958) (plurality op.) (invalidating expatriation statute because "[w]hen the Government acts to take away the fundamental right of citizenship, the safeguards of the Constitution should be examined with special diligence").

Citizenship is the "most basic right[,] . . . for it is nothing less than the right to have rights." *Perez v. Brownell*, 356 U.S. 44, 64 (1958) (Warren, C.J., dissenting).[20]   Under the Fourteenth Amendment's Privileges or Immunities Clause, all of an individual's "fundamental rights, privileges, and immunities which belong to him as a free man and a free citizen, now belong to him as a citizen of the United States." *Slaughter-House Cases*, 83 U.S. at 95; *see* U.S. Const., amend. XIV, § 1, cl. 2.  Almost a century later, the Court reiterated that "American citizenship . . . is one of the most valuable rights in the world today." *Mendoza-Martinez*, 372 U.S. at 160 (quotation marks omitted).  It is now "beyond dispute" that "federal rights flow to the people of the United States by virtue of national citizenship." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 844 (1995) (Kennedy, J., concurring).

---

[20] Chief Justice Warren's *Perez* dissent was later vindicated *Perez* was later overruled by *Afroyim*, 387 U.S. at 268.

The district court deemed the Supreme Court's statements about citizenship's fundamental importance to be "unpersuasive" *dicta* from cases that did not address "territorial citizenship." JA47-48. Instead, the court relied upon "voluminous federal case law" to reject the claim that birthright citizenship is a fundamental right in U.S. Territories. *Id.* But this "voluminous" case law consisted primarily of Justice Brown's individual opinion in *Downes* and a series of inapposite cases about the Philippines that expressly avoided reaching the fundamental rights question. *See*, *e.g.*, *Rabang*, 35 F.3d at 1453 n.8; *Valmonte*, 136 F.3d at 918 n.7. The district court's rejection of the claim that constitutional birthright citizenship is a fundamental protection for persons born in Territories cannot be squared with the Supreme Court's emphatic statements, over nearly 150 years since the Fourteenth Amendment's ratification, about the importance of the citizenship right.

**B.    Persons Born In American Samoa Are Entitled To Constitutional Birthright Citizenship Unless It Would Be "Impractical And Anomalous."**

In *King*, this Court considered the application of the jury trial right in American Samoa, emphasizing that the *Insular Cases* framework requires more than simply considering whether a right is "fundamental," because territorial history and contemporary context also matter. 520 F.2d at 1146-47. That context-sensitive reading of the *Insular Cases* was recently reinforced by the Supreme

51

Court in *Boumediene*. Thus, assuming the *Insular Cases* framework even applies here, *King* requires a remand so the district court can assess whether it would be "impractical and anomalous" to apply constitutional birthright citizenship "to the situation as it exists in American Samoa today." *Id.* at 1147.

### 1. *King v. Morton* requires an assessment of contemporary circumstances.

In *King*, this Court considered the claim that American Samoan laws that denied jury trial rights for serious criminal offenses were "unconstitutional on their face and as applied to plaintiff." 520 F.2d at 1143 (quoting complaint). At the start of its analysis, the Court recognized that three of the *Insular Cases* had denied the right to jury trial in other Territories and concluded that it was *not* a fundamental right. *See id.* at 1146 (citing cases). While acknowledging that those decisions "have never been overruled," this Court emphasized the importance of "the contexts in which those cases were decided," because they were decided "at a time much earlier in our nation's history." *Id.* at 1147.

Concluding that the *Insular Cases* framework requires more than simply assessing whether a right is "fundamental" or a Territory is "unincorporated," the Court explained that a decision "can be reached only by applying the principles of the earlier cases, *as controlled by their respective contexts, to the situation as it exists in American Samoa today*." *Id.* (emphasis added). Accordingly, this Court adapted the test articulated by Justice Harlan in *Reid v. Covert*, concluding that the

52

dispositive inquiry was "whether in American Samoa 'circumstances are such that trial by jury would be impractical and anomalous.'" *Id.* (quoting *Reid*, 354 U.S. at 75 (Harlan, J., concurring in result)).

*King* went on to emphasize that "[t]he importance of the constitutional right at stake makes it essential that a decision in this case rest on a solid understanding of the present legal and cultural development of American Samoa.    That understanding cannot be based on unsubstantiated opinion; it must be based on facts."    520 F.2d at 1147 (emphasis added).    Reversing the district court's dismissal, this Court remanded the case so that "an adequate factual record may be developed." *Id.*

On remand, opponents of criminal jury trials in American Samoa argued that the right to trial by jury would "undercut the preservation of traditional values," and disrupt the Fa'a Samoa, or Samoan way of life. *King v. Andrus*, 452 F. Supp. at 12-13.   The district court rejected these arguments as a factual matter, finding that the right to jury trial for serious criminal offenses would not be "impractical and anomalous" in American Samoa and that laws denying this right were "unconstitutional on their face and as applied to plaintiff." *Id.* at 17.

The decision below declined to follow *King* on the grounds that the plaintiff in that case was already recognized as a U.S. citizen. JA52.   This misreads *King*, which concerned American Samoan laws that generally denied the right to jury

trial to *all* residents. Citizenship was only relevant to some of the plaintiff's arguments for subject-matter jurisdiction. *See King*, 520 F.2d at 1145-46 (assessing statutory jurisdiction over violations of citizens' civil rights). In fact, the *King* Court's opinion *never* cited the plaintiff's citizenship in its legal analysis, nor was its remand limited to factual development about the practicality of jury trials for U.S. citizens alone. On remand, the district court broadly held that American Samoan laws denying criminal trial by jury were "unconstitutional on their face," with no suggestion that this ruling was limited by application to those already recognized as U.S. citizens. *King v. Andrus*, 452 F. Supp. at 17.

The decision below also suggested that *King*'s reading of the *Insular Cases* was superseded by this Court's decision in *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Hodel*, 830 F.2d 374 (D.C. Cir. 1987), simply because *Hodel* was a "later case." JA53. But that is *precisely* why *Hodel* did not and could not overrule *King*: one three-judge panel of this Court cannot overrule another. *LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (*en banc*).

Moreover, *Hodel* approvingly cited *King* without ever suggesting any inconsistency or tension between the two decisions. *See* 830 F.2d at 383 n.58. Nor is there any. *King* balanced Congress's power to administer Territories against an explicit constitutional constraint on governmental authority, which required

assessing the facts on the ground, consistent with the *Insular Cases* framework. By contrast, the claim in *Hodel* faltered at the threshold question of whether there was any constitutional right to be balanced against Congress's territorial authority at all.

The *Hodel* plaintiff argued that American Samoa's judicial system was insufficiently independent of the Secretary of Interior, in supposed violation of an unenumerated due process right to be heard by a fully independent territorial court. 830 F.2d at 383-84. In response, this Court observed that "[i]t does not require much explication of Congress' plenary authority over the territories, as provided in Article IV, to unhorse this claim," because the Supreme Court had consistently rejected similar challenges to territorial courts since 1828. *Id.* at 384. *Hodel* referenced the *Insular Cases* only in passing, when rejecting the argument that "access to an independent court" was a "fundamental right" in the Territories. *Id.* at 385. Ultimately, however, the Court saw "no real distinction" between American Samoa and other Territories as to the proposed constitutional right, because accepting its existence and applying it in *any* Territory would leave "no place at all for the exception from the general prescription of [Article] III for territorial courts, *which dates from the earliest days of the Republic*." *Id.* at 386 (quotation marks omitted, emphasis added).

Even if the *Insular Cases* framework applies here, *King* mandates a factual inquiry that cannot be resolved on a motion to dismiss. Only by examining the facts and circumstances in American Samoa today can it be determined whether it would be impractical and anomalous to recognize birthright citizenship there.

### 2.     The Supreme Court has also endorsed a context-sensitive reading of the *Insular Cases*.

Over the last fifty years, from *Reid v. Covert* to *Boumediene v. Bush*, the Supreme Court has moved toward a context-sensitive reading of the *Insular Cases* framework, like that in *King*, and away from the type of inflexible approach that the district court took here. In *Boumediene*, when discussing the *Insular Cases*' relevance in Territories today, the Court opined that "[i]t may well be that over time the ties between the United States and any of its territories strengthen in ways that are of constitutional significance." 553 U.S. at 759; *see also id.* (approvingly citing *Torres v. Puerto Rico*, 442 U.S. 465, 475-476 (1979) (Brennan, J., concurring in judgment) ("Whatever the validity of the *Insular Cases* in the particular historical context in which they were decided, those cases are clearly not authority for questioning the application of the Fourth Amendment—or any other provision of the Bill of Rights—to the Commonwealth of Puerto Rico in the 1970's.")).

Like *King*, the Supreme Court in *Boumediene* similarly embraced Justice Harlan's view in *Reid* that the central lesson of the *Insular Cases* was their

emphasis on "'the particular circumstances, the practical necessities, and the possible alternatives which Congress had before it' and, in particular, whether judicial enforcement of [a] provision would be 'impracticable and anomalous.'" 553 U.S. at 760 (quoting *Reid,* 354 U.S. at 74-75 (Harlan, J., concurring in result); *cf. United States v. Verdugo-Urquidez*, 494 U.S. 259, 277-278 (1990) (Kennedy, J., concurring) (applying "impracticable and anomalous" test when assessing Fourth Amendment's application in foreign country).  *Boumediene* thus reinforces *King*'s understanding that history and context are paramount whenever the *Insular* Cases framework is used to evaluate the application of a constitutional right in a Territory today.

### 3. Birthright citizenship would not be "impractical and anomalous" in American Samoa.

To the extent that the *Insular Cases* framework applies here, the district court erred by not examining the facts on the ground in American Samoa today to determine whether recognizing birthright citizenship would be "impractical and anomalous."  In fact, the only thing that is impractical and anomalous is the "non-citizen national" label itself.

Birthright citizenship is already recognized for children born in American Samoa to parents who are recognized as U.S. citizens.  *See* 8 U.S.C. § 1401(e). Many others living in American Samoa are also already recognized as citizens, either because they naturalized or were born elsewhere in the United States.

Indeed, American Samoa's laws appear to draw no distinction between citizens and non-citizen nationals.  *See, e.g.*, A.S.C.A. § 41.0202(j).

Further, federal law recognizes that both citizens and non-citizen nationals— *i.e.*, American Samoans—already owe "permanent allegiance" to the United States. *See* 8 U.S.C. § 1101(a)(22), (29); *id.* § 1408(1).  American Samoans regularly reaffirm that allegiance and undertake the obligations of citizenship, even if denied that status, through their disproportionate service and sacrifice in the U.S. Armed Forces, and through republican self-government and regular elections to send a federal representative to Congress.

The historical experience of other U.S. Territories further confirms that birthright citizenship would not be impractical and anomalous in American Samoa. Birthright citizenship has already been recognized by statute, without incident, in the Territories of Puerto Rico, Guam, the U.S. Virgin Islands, and the Northern Mariana Islands.  JA24-25.  Moreover, citizenship has not undercut the Northern Mariana Islands' land preservation laws, which are similar to those in American Samoa.  *See, e.g.*, *Wabol v. Villacrusis*, 958 F.2d 1450, 1461 (9th Cir. 1990) (following *King v. Morton* to reject equal protection challenge to land alienation laws in the Northern Mariana Islands).

Every day, Plaintiffs and other American Samoans living throughout the United States are reminded that it is their "non-citizen national" status that is in

58

fact impractical and anomalous.  As alleged, they must navigate a confusing patchwork of federal and state laws that often treat them less favorably than citizens, and sometimes even less favorably than permanent resident aliens.  JA28-29.  Even those living in the States are denied core constitutional rights, such as the right to vote, the right to hold public office or public sector employment, the right to serve on juries, and even sometimes the right to bear arms.  JA29-30.  To be treated like other Americans, they must submit to the costly, burdensome, and uncertain naturalization process, which also requires passing an English and civics test and foreswearing any foreign allegiance.  JA26.  Yet American Samoa's schools already teach English-instructed U.S. curricula, American Samoans already participate in U.S. democracy, and American Samoans are already born in allegiance to the United States.  JA25-26.

Under the *King* framework, a determination about whether constitutional birthright citizenship applies in contemporary American Samoa must rely on "solid evidence of actual and existing conditions."  520 F.2d at 1148.  Thus, even assuming the application of the *Insular Cases* framework to this case, the district court erred by dismissing the Complaint without a fact-based "understanding of the present legal and cultural development of American Samoa."  *Id.*

59

## III.  THE PUTATIVE INTERVENORS DO NOT SATISFY THE STRICT STANDARD FOR INTERVENTION ON APPEAL.

Movants American Samoa Government and Congressman Faleomavaega filed a Motion to Intervene or, in the Alternative, for Leave to Participate as *Amicus Curiae* in this appeal.  On February 4, 2014, this Court's motions panel referred consideration of that request to the merits panel and ordered the parties to address the filing in their merits briefs.  Plaintiffs do not oppose Movants' participation as *amici curiae*, but Movants have no valid basis to intervene directly on appeal.  This Court allows intervention on appeal "where none was sought in the district court only in an exceptional case for imperative reasons." *Amalgamated Transit Union Int'l, AFL-CIO v. Donovan*, 771 F.2d 1551, 1552 (D.C. Cir. 1985) (internal quotation marks omitted).  This is not an exceptional case, and there are no imperative reasons.

Congressman Faleomavaega never sought to intervene in the district court, despite participating in the proceedings below as *amicus curiae*.  The American Samoa Government only moved to intervene in the district court six months after briefing completed on Defendants' motion to dismiss.  JA7.  Although the intervention motion was denied as moot following the dismissal of Plaintiffs' claims, the American Samoa Government never appealed that denial, as it could have.  JA7; *see Alt. Research & Dev. Found. v. Veneman*, 262 F.3d 406, 409 (D.C. Cir. 2001).  Having failed to pursue intervention diligently, if at all, Movants

cannot show it is "imperative" for them to intervene now.  Moreover, they cannot

show that Defendants will not vigorously pursue affirmance of the decision below,

and any additional arguments that they wish this Court to consider can be

adequately presented through an *amicus* brief.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court

reverse the dismissal of the Complaint and remand for appropriate further

proceedings.

Dated:  April 25, 2014                              Respectfully submitted,

                                                                 /s/ Murad Hussain

Neil C. Weare                                       Robert J. Katerberg
WE THE PEOPLE PROJECT                               Murad Hussain
1421 T Street N.W., Ste. 10                         Elliott C. Mogul
Washington, D.C.  20009                             Dawn Y. Yamane Hewett
(202) 304-1202                                      Robert A. DeRise
                                                    ARNOLD & PORTER LLP
Charles Ala'ilima                                   555 Twelfth Street, N.W.
LAW OFFICE OF                                       Washington, D.C.  20004-1206
  CHARLES V. ALA'ILIMA, PLLC                        (202) 942-5000
P.O. Box 1118                                       Murad.Hussain@aporter.com
Nu'uuli, AS 96799
(684) 699-6732

*Counsel for Plaintiffs-Appellants Leneuoti F. Tuaua; Va'aleama T. Fosi;*
*Fanuatanu F. L. Mamea, on his own behalf and on behalf of his minor children,*
*M.F.N., L.C.M., and E.T.M.; Taffy-Lei T. Maene; Emy F. Afalava;*
*and the Samoan Federation of America, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify as follows:

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,994 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii);

2.     This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007, in 14-point Times New Roman font.

3.     The text of the electronic version of this brief is identical to the text of the paper copies of this brief.

Dated:  April 25, 2014                    /s/ Murad Hussain

                                          Murad Hussain
                                          ARNOLD & PORTER LLP
                                          555 Twelfth Street, N.W.
                                          Washington, D.C.  20004-1206
                                          (202) 942-5000
                                          Murad.Hussain@aporter.com

                                          *Counsel for Plaintiffs-Appellants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 25, 2014, I electronically filed the foregoing Brief of Plaintiffs-Appellants with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit via the Court's appellate Case Management/Electronic Case Files (CM/ECF) system, causing a true and correct copy to be served upon all counsel of record who are registered CM/ECF users.

Further, I hereby certify that I dispatched seven (7) paper copies to a third-party commercial carrier for delivery to the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit.  In addition, one paper copy will be served via third-party commercial carrier on the following party:

Wynne P. Kelly
Assistant United States Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 252-2545

/s/ Murad Hussain

Murad Hussain
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C.  20004-1206
(202) 942-5000
Murad.Hussain@aporter.com

*Counsel for Plaintiffs-Appellants*

## STATUTORY AND REGULATORY ADDENDUM

### 8 U.S.C. § 1408(1)

Unless otherwise provided in section 1401 of this title, the following shall be nationals, but not citizens, of the United States at birth:

(1) A person born in an outlying possession of the United States on or after the date of formal acquisition of such possession . . . .

### 8 U.S.C. § 1101(a)(29)

(a) As used in this chapter— . . .

(29) The term "outlying possessions of the United States" means American Samoa and Swains Island.

### 7 FAM § 1125.1(b) & (d)

b.    American Samoa and Swains Island are not incorporated territories, and the citizenship provisions of the Constitution do not apply to persons born there. . . .

d.    Section 308(1) and (3) INA provides non-citizen U.S. nationality for the people born (or foundlings) in American Samoa and Swains Island (see 7 FAM 1121.4-2 for text of Sec 308 (1) and (3) INA).

### 7 FAM § 1130, App'x H ¶ c

c.    Documentation Issued to Non-Citizen Nationals: A passport containing the following endorsement is issued to non-citizen nationals. . . .  The endorsement is Code 09 and states:

| |
|---|
| "THE BEARER IS A UNITED STATES NATIONAL AND NOT A UNITED STATES CITIZEN." |